**PUBLISHED**

UNITED STATES COURT OF APPEALS
FOR THE FOURTH CIRCUIT

**No. 17-2399**

SIERRA CLUB, INC.; APPALACHIAN VOICES; WILD VIRGINIA, INC.,

        Petitioners,

      v.

UNITED STATES FOREST SERVICE; UNITED STATES DEPARTMENT OF AGRICULTURE,

        Respondents,

MOUNTAIN VALLEY PIPELINE, LLC,

        Intervenor.

------------------------------

CHEROKEE FOREST VOICES; THE CLINCH COALITION; GEORGIA FORESTWATCH; MOUNTAINTRUE,

        Amici Supporting Petitioner.

On Petition for Review of a Decision of the United States Forest Service.

**No. 18-1012**

THE WILDERNESS SOCIETY; PRESERVE CRAIG, INC.; SAVE MONROE, INC.,

        Petitioners,

v.

UNITED STATES FOREST SERVICE; UNITED STATES DEPARTMENT OF AGRICULTURE,

Respondents,

MOUNTAIN VALLEY PIPELINE, LLC,

Intervenor.

_____

On Petition for Review of a Decision of the United States Forest Service.

_____

No. 18-1019

_____

SIERRA CLUB, INC.; APPALACHIAN VOICES; WILD VIRGINIA, INC.,

Petitioners,

v.

UNITED STATES DEPARTMENT OF THE INTERIOR; UNITED STATES BUREAU OF LAND MANAGEMENT; UNITED STATES FOREST SERVICE; UNITED STATES DEPARTMENT OF AGRICULTURE,

Respondents,

MOUNTAIN VALLEY PIPELINE, LLC,

Intervenor.

------------------------------

CHEROKEE FOREST VOICES; THE CLINCH COALITION; GEORGIA FORESTWATCH; MOUNTAINTRUE,

Amici Supporting Petitioner.

_____

On Petition for Review of a Decision of the Bureau of Land Management. (VA-ES-058143; WV-ES-058142)

_____

## No. 18-1036

_____

THE WILDERNESS SOCIETY; PRESERVE CRAIG, INC.; SAVE MONROE, INC.,

        Petitioners,

      v.

UNITED STATES DEPARTMENT OF THE INTERIOR; UNITED STATES BUREAU OF LAND MANAGEMENT; UNITED STATES FOREST SERVICE; UNITED STATES DEPARTMENT OF AGRICULTURE,

        Respondents,

MOUNTAIN VALLEY PIPELINE, LLC,

        Intervenor.

_____

On Petition for Review of a Decision of the Bureau of Land Management. (VA-ES-058143; WV-ES-058142)

_____

Argued: May 8, 2018                         Decided: July 27, 2018

_____

Before GREGORY, Chief Judge, and TRAXLER, and THACKER, Circuit Judges.

_____

Petitions granted, vacated and remanded by published opinion. Judge Thacker wrote the opinion, in which Chief Judge Gregory and Judge Traxler joined.

_____

**ARGUED:** Nathan Matthews, SIERRA CLUB ENVIRONMENTAL LAW PROGRAM, Oakland, California, for Petitioners. Kevin William McArdle, UNITED STATES DEPARTMENT OF JUSTICE, Washington, D.C., for Respondents. George Peter Sibley, III, HUNTON ANDREWS KURTH LLP, Richmond, Virginia, for Intervenor.

3

**ON BRIEF:** Elizabeth Fay Benson, SIERRA CLUB ENVIRONMENTAL LAW PROGRAM, Oakland, California, for Petitioners Sierra Club, Wild Virginia, and Appalachian Voices. Tammy L. Belinsky, Copper Hill, Virginia, for Petitioners The Wilderness Society, Preserve Craig, and Save Monroe. Jeffrey H. Wood, Acting Assistant Attorney General, Eric Grant, Deputy Assistant Attorney General, J. David Gunter II, Emily A. Polachek, Environment & Natural Resources Division, UNITED STATES DEPARTMENT OF JUSTICE, Washington, D.C.; John Henson, Haninah Levine, Office of the Solicitor, UNITED STATES DEPARTMENT OF THE INTERIOR, Washington, D.C.; Jay McWhirter, Sarah Kathmann, Office of the General Counsel, UNITED STATES DEPARTMENT OF AGRICULTURE, Washington, D.C., for Respondents. Kevin S. Elliker, HUNTON ANDREWS KURTH LLP, Richmond, Virginia; Thomas C. Jensen, Washington, D.C., Murray D. Feldman, Boise, Idaho, Sandra A. Snodgrass, HOLLAND & HART LLP, Denver, Colorado, for Intervenor. J. Patrick Hunter, Austin D. Gerken, Jr., Amelia Y. Burnette, Asheville, North Carolina; Gregory Buppert, SOUTHERN ENVIRONMENTAL LAW CENTER, Charlottesville, Virginia, for Amici Curiae.

_____

THACKER, Circuit Judge:

In this case, we address petitions seeking review of two federal agency decisions. The first is the Bureau of Land Management ("BLM")'s decision granting a right of way through federal land for construction and operation of a pipeline proposed by Mountain Valley Pipeline, LLC ("MVP"). The second is the United States Forest Service ("Forest Service")'s decision to amend the Jefferson National Forest Land Resource Management Plan to accommodate the right of way and pipeline construction. Sierra Club, Inc.; Appalachian Voices; Wild Virginia, Inc.; the Wilderness Society; Preserve Craig, Inc.; and Save Monroe, Inc. (collectively, "Petitioners") claim that by these decisions, the federal agencies violated the National Environmental Policy Act ("NEPA"), the Mineral Leasing Act ("MLA"), and the National Forest Management Act ("NFMA").

After careful review, we conclude that aspects of the Forest Service's decision fail to comply with NEPA and the NFMA. As more fully explained below, we grant the petition challenging the Forest Service's decision and vacate that decision. We also conclude that the BLM failed to acknowledge its obligations under the MLA, and therefore, we also grant the petition challenging the BLM decision and vacate that decision. We remand to the respective agencies for further proceedings consistent with this opinion.

I.

A.

*The Pipeline Project and FERC*

MVP plans to construct, operate, and maintain approximately 303.5 miles of new underground, 42-inch diameter pipeline extending from Wetzel County, West Virginia, to Pittsylvania County, Virginia. The trench for the pipeline will be at least 54 inches wide and 5.5 to 9 feet deep. Construction will involve "remov[ing] trees, shrubs, brush, roots, and large rocks" and will initially require a 75-foot to 125-foot right of way for construction purposes, and a subsequent 50-foot right of way for at least 30 years to accommodate the pipeline's operation. J.A. 102–03, 107.[1]

On October 13, 2017, the Federal Energy Regulatory Commission ("FERC") issued a Certificate of Public Convenience and Necessity for MVP's pipeline project ("Certificate"). Pursuant to the Natural Gas Act ("NGA"), a natural gas company is not permitted to undertake construction of a pipeline unless FERC first issues a Certificate authorizing such construction. *See* 15 U.S.C. § 717f(c)(1)(A). Before doing so, in most cases FERC "shall set the matter for hearing and shall give such reasonable notice of the hearing thereon to all interested persons as in its judgment may be necessary under [FERC's] rules and regulations." *Id*. § 717f(c)(1)(B). FERC also "shall have the power to attach to the issuance of the certificate and to the exercise of the rights granted

---

[1] Citations to the "J.A." refer to the Corrected Deferred Joint Appendix filed by the parties in this appeal.

thereunder such reasonable terms and conditions as the public convenience and necessity may require." *Id.* § 717f(e). Petitioners do not challenge FERC's issuance of the Certificate in this case.

FERC was also required to issue an Environmental Impact Statement ("EIS").[2] Pursuant to NEPA, when a federal agency proposes to take a "major Federal action[]" significantly affecting the quality of the human environment," the agency must prepare a detailed EIS describing the likely environmental effects, "adverse environmental effects which cannot be avoided," and potential alternatives to the proposal. 42 U.S.C. § 4332(C). Multiple agencies may cooperate to issue an EIS, but a "lead agency" is usually designated. 7 C.F.R. § 3407.11(a).[3] Where an interstate gas pipeline is involved, FERC acts as the lead NEPA agency. *See* 15 U.S.C. § 717n(b)(1); *see also EarthReports, Inc. v. FERC*, 828 F.3d 949, 953 (D.C. Cir. 2016). Here, the BLM and the Forest Service served as cooperating agencies and ultimately adopted the EIS.

---

[2] The issues in this case concern both the draft EIS and the final EIS. Unless otherwise noted, the acronym "EIS" in this opinion refers to the *final* Environmental Impact Statement issue by FERC.

[3] This regulation provides, "If more than one Federal agency participates in a program activity, a lead agency shall be selected . . . . The lead agency, in full cooperation with all participating agencies, shall assume responsibility for involving the public . . . and shall prepare the EIS or shall cause the EIS to be prepared . . . ." 7 C.F.R. § 3407.11(a).

7

B.

*The Pipeline Project and the BLM*

It is not enough, however, that FERC issued a Certificate and an EIS. Because portions of the proposed pipeline route cross federally owned lands, MVP was also required to obtain rights of way and temporary use permits from the federal government to construct and operate the pipeline on those lands. The proposed right of way will cross land managed by two different agencies -- the Forest Service (3.6 miles or approximately 83 acres of the Jefferson National Forest in West Virginia and Virginia) and the Army Corps of Engineers (60 feet of the Weston and Gauley Bridge Turnpike Trail in Braxton County, West Virginia) -- which means the Department of the Interior is responsible for issuing rights of way and attendant permits. *See* 30 U.S.C. § 185(c)(2) ("Where the surface of the Federal lands involved is administered by . . . two or more Federal agencies, the Secretary [of the Interior] is authorized, after consultation with the agencies involved, to grant or renew rights-of-way or permits through the Federal lands involved."). In situations involving oil and gas pipeline rights of way, the Department of the Interior has delegated that authority to the BLM. *See* 36 C.F.R. § 251.54(b)(3). Importantly, the BLM must have the concurrence of the Forest Service and the Army Corps of Engineers in order to grant the necessary rights of way or permits. *See* 30 U.S.C. § 185(c)(2); 43 C.F.R. § 2884.26.[4]

---

[4] The Army Corps of Engineers is not a party to this case.

8

On December 20, 2017 -- upon review of the pertinent regulations, FERC's EIS, and public comments, and with the concurrence of the Forest Service and the Corps of Engineers -- the BLM issued a Rule of Decision ("ROD") granting a 30 year, 50-foot operational right of way and associated temporary use permits across 3.6 miles of the Jefferson National Forest. The BLM explicitly adopted the EIS and "prepared th[e] ROD based on information contained" therein. J.A. 574.

C.

*The Pipeline Project and the Forest Service*

In addition to the Certificate, EIS, and right of way, MVP was also required to ensure compliance with a Land Resource Management Plan governing the Jefferson National Forest (the "Jefferson Forest Plan"). Pursuant to the NFMA, any plans, permits, or contracts for use of the Jefferson National Forest "shall be consistent with" the Jefferson Forest Plan. 16 U.S.C. § 1604(i). Here, it is undisputed that the pipeline project, as proposed, is not consistent with certain aspects of that plan. *See* J.A. 1280 (Forest Service ROD: "[A]mendment [to the Jefferson Forest Plan] is needed because the MVP Project cannot achieve several Forest Plan standards . . . ."). In such a case, the Forest Service has four options:

> (1) modify the proposed project to make it consistent with the Forest Plan; (2) reject the proposal; (3) amend the Forest Plan so that the project would be consistent with the plan as amended; or (4) amend the Forest Plan simultaneously with the approval of the project so the project would be consistent with the plan as amended[.] [Such amendments] may be limited to apply only to the project.

9

J.A. 1271 (citing 36 C.F.R. § 219.15(c) (offering these four options if "a proposed project . . . would not be consistent with the application plan components")). In its ROD filed on December 1, 2017, the Forest Service decided it would select option four above and amend the Jefferson Forest Plan such that the MVP project would be consistent with that plan, but those amendments would only apply to the MVP project.

D.

*The Pipeline Project and Review of Agency Decisions*

Petitioners seek review of the BLM and Forest Service RODs, and we possess jurisdiction to review them pursuant to the Administrative Procedure Act, *see* 5 U.S.C. §§ 701–06, and the NGA, *see* 15 U.S.C. § 717r(d)(1) ("The United States Court of Appeals for the circuit in which a [natural gas] facility . . . is proposed to be constructed, expanded, or operated shall have original and exclusive jurisdiction over any civil action for the review of an order or action of a Federal agency . . . to issue, condition, or deny any permit, license, concurrence, or approval . . . required under Federal law . . . .").

II.

We may "'hold unlawful and set aside [a federal] agency action' for certain specified reasons, including whenever the challenged act is 'arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with the law.'" *Friends of Back Bay v. U.S. Army Corps of Eng'rs*, 681 F.3d 581, 586–87 (4th Cir. 2012) (quoting 5 U.S.C. § 706(2)(A)).

> An agency's decision is arbitrary and capricious if the agency relied on factors which Congress has not intended it to consider, entirely failed to consider an important aspect of the

10

problem, offered an explanation for its decision that runs counter to the evidence before the agency, or is so implausible that it could not be ascribed to a difference in view or the product of agency expertise.

*Defs. of Wildlife v. N.C. Dep't of Transp.*, 762 F.3d 374, 396 (4th Cir. 2014) (quoting

*Motor Vehicle Mnfs. Ass'n v. State Farm Mut. Auto. Ins.*, 463 U.S. 29, 43 (1983)).

III.

Petitioners raise a host of alleged violations of NEPA, the NFMA, and the MLA. We address each of these Acts and alleged violations in turn.

A.

*The National Environmental Policy Act*

Congress enacted NEPA, in part, "to reduce or eliminate environmental damage." *Dep't of Transp. v. Pub. Citizen*, 541 U.S. 752, 756 (2004). "NEPA itself does not mandate particular results in order to accomplish these ends," but rather, "imposes only procedural requirements on federal agencies with a particular focus on requiring agencies to undertake analyses of the environmental impact of their proposals and actions." *Id*. at 756–57 (internal quotation marks omitted). NEPA's procedures require that agencies "take a hard look at environmental consequences" and "provide for broad dissemination of relevant environmental information." *Robertson v. Methow Valley Citizens Council*, 490 U.S. 332, 350 (1989) (internal quotation marks omitted).

As explained above, FERC, as lead agency for natural gas pipeline projects, issued the EIS. Nonetheless, the Forest Service and the BLM may adopt FERC's EIS, but only if the EIS "meets the standards for an adequate statement" under pertinent

11

regulations, 40 C.F.R. § 1506.3(a), and only if the agencies undertake "an independent review of the statement" and determine that their "comments and suggestions have been satisfied," *id*. § 1506.3(c); *see also Hughes River Watershed Conservancy v. Glickman*, 81 F.3d 437, 445 & n.6 (4th Cir. 1996).

1.

*Erosion and Sedimentation*[5]

We begin with Petitioners' argument that the Forest Service violated NEPA by adopting and relying upon the EIS's analysis of erosion and sedimentation effects in the Jefferson National Forest. *See, e.g.*, J.A. 1269 (Forest Service ROD "adopt[ing] the environmental analysis prepared by FERC"); *id*. at 1274 ("All design features and mitigation measures described in the []EIS that are applicable to N[ational] F[orest] S[ervice] land are incorporated by reference into [the ROD]."). Specifically, Petitioners contend that the "EIS is invalid[.] [It] fails to take the required hard look at impacts within Jefferson National Forest." Pet'rs' Br. 2.[6]

---

[5] Erosion is defined as the "removal of surface material from the Earth's crust, primarily soil and rock debris, and the transportation of the . . . materials by natural agencies (such as water or wind) from the point of removal." Erosion, *Encyclopaedia Brittanica: Geology*, https://www.britannica.com/science/erosion-geology (enclosed as PDF attachment). Sedimentation is defined as the "process of deposition of a solid material," or sediment, "from a state of suspension or solution in a fluid," here, the waters in the vicinity of the Jefferson National Forest. Sedimentation, *Encyclopaedia Brittanica: Geology*, https://www.britannica.com/science/sedimentation-geology (enclosed as PDF attachment).

[6] We decline to address any arguments by Petitioners that seek to challenge FERC's actions in composing the EIS. FERC is not a party to this case, and such challenges are being made elsewhere, via the FERC rehearing process, *see* FERC-CP 16- (Continued)

12

a.

*The Hydrologic Report*

In assessing the impacts of erosion and sedimentation that would occur as a result of pipeline construction and operation in the Jefferson National Forest, FERC relied on a report entitled "Hydrologic Analysis of Sedimentation," *see* J.A. 234–36, which was prepared by MVP and attached to the EIS, *see id.* at 297–327 (Appendix O–3) (the "Hydrologic Report").

There were three drafts of the Hydrologic Report. The first was completed on June 7, 2016, and released to the public on July 25, 2016. *See* J.A. 1311–26. Although that report observed that pipeline construction in the Jefferson National Forest "has potential to introduce temporary excess sediment into waterways . . . which may result in changes to water quality and potentially temporarily impact aquatic biota," *id.* at 1313, it also noted that the results in the analysis "represent[ed] a worst case scenario" because the first draft did not address erosion and sediment control measures or best management practices ("BMP"s) that would reduce sedimentation effects, *id.* at 1324. The Forest Service promptly filed comments to the first draft on August 16, 2016. One of its main concerns was that the draft "treats the [sedimentation] disturbance as a single-year

10-000, and in the D.C. Circuit, *see Appalachian Voices v. FERC*, No. 17-1271 (D.C. Cir. filed Dec. 22, 2017). In this matter, we address only the arguments that the Forest Service and the BLM failed to comply with applicable regulations in adopting and relying upon the EIS.

occurrence." *Id.* at 1330. It asked MVP to "estimate when (if ever) sediment yields return to pre-disturbance levels." *Id.*

MVP then submitted a second draft of the Hydrologic Report on March 3, 2017. *See* J.A. 297–327. It addressed the Forest Service's concern and explained that sediment yields would reach a "new sediment equilibrium" within approximately four to five years from the start of the project, which for "the majority of streams" would represent one percent or less increase in sedimentation load over baseline conditions. *Id.* at 323. But it also predicted a new sediment equilibrium in excess of 10 percent over baseline for "several streams within the New River drainage." *Id.*

The second draft also considered BMPs and containment measures such as sediment basins, traps, and barriers,[7] and it attempted to determine a proper estimate of reduction in sediment load expected from those measures. It explained that "performance estimates vary widely among studies with some estimates as low as 55 percent . . . [and some] as high as 99 percent." J.A. 310. The second draft of the report also cited to a 2007 study from the Environmental Protection Agency ("EPA"), which concluded that with the use of sediment basins, "annual average sediment reductions ranged from 77 to 93 percent." *Id.* The second draft cited still another study, a 2014 Master's thesis

---

[7] Sediment basins and traps "are designed to promote settling of sediment by reducing flow velocities." J.A. 310. Sediment barriers, such as silt fences, "are installed to intercept and detain sediment from disturbed areas and to decrease the velocity of sheet flows." *Id.* at 311. Sheet flow is when water "flow[s] overland as a sheet instead of in definite channels or rills." Sheet erosion, *Encyclopaedia Britannica: Geology*, https://www.britannica.com/science/sheet-erosion (enclosed as PDF attachment).

14

examining sediment barriers "evaluated containment at a variety of slopes and rainfall events and found that overall average projected performance efficiency ranged from 48 to 87 percent with a mean and median of 79 and 86 percent, respectively." *Id*. at 311. In light of this data, the second draft concluded that 79% containment would be a proper figure to use "to model the benefits of erosion and sediment control practices" expected for the pipeline project. *Id*.

The second draft also grappled with setting a proper exceedance threshold for impact of sedimentation on waterbodies. Ultimately, it decided to utilize a "commonly used impact threshold" of 10% "to assess potential changes associated with sedimentation." J.A. 314–15. It then delineated streams and downstream waterbodies within the vicinity of the pipeline route with expected sediment loads or sediment increases of "10 percent or greater." *Id.* at 319, 322. Initially, the Forest Service expressed concern with this analysis, especially with regard to Threatened and Endangered Species ("TES"). At an April 6, 2017 meeting with consultants who composed the report, Forest Service officials expressed concern that "organisms respond differently to increases in sedimentation, and a 10% impact threshold to determine when impacts would occur is likely not relevant." *Id*. at 1357–58.

The Forest Service filed comments to the second draft on April 25, 2017, and conveyed apprehension with both the 79% and 10% figures. It explained:

- "Since many of the literature citations [offered in the second draft] are laboratory based and proper installation is widely understood in the industry to be a limiting factor for effectiveness in the field, [79%] is a vast overestimate of containment. It is more appropriate to err on the side of the

15

worst case scenario, rather than the best case. Update the analysis to reflect a . . . factor, equal to or less than 48% containment." J.A. 1361.

- "The commonly used threshold of 10% may be a valid assumption for [areas that] meet[] water quality standards or do not contain sensitive aquatic biota. However, in downstream areas where TES aquatic species are present, it is important to further evaluate cumulative impacts less than 10% increase in sediment load, particularly if construction may coincide with low flow conditions. . . . Update the analysis to include cumulative effects delineation for Stony Creek and Craig Creek [both of which contain TES], and track updates (where appropriate) in the tables and figures." J.A. 1362. The Forest Service also explained, "If there are impacts to sensitive species the F[orest] S[ervice] must analyze the significance of adverse effects on the populations, its habitat, and on the viability of the species as a whole." *Id.*

After the Forest Service filed these comments, representatives of the Forest Service and MVP met on May 9, 2017, to discuss the Forest Service's concerns. During that meeting, MVP representatives expressed "concern[] that lowering the containment value from 79% to 48% . . . *would have ramifications for the entire project analysis* and would not accurately reflect the work that MVP has already done." J.A. 1363 (emphasis supplied). A representative from Environmental Solutions & Innovations, the company that completed the Hydrologic Report, explained that "the 79% containment figure was based on a field test thesis paper study," and thus, was not *strictly* laboratory based. *Id.*

In turn, the Forest Service urged MVP to provide "additional supporting documentation for how MVP came up with their model assumptions, in particular containment efficiency." J.A. 1363. One of the Forest Service officials "stressed" that

16

"good plans aren't enough and must be bolstered by consistent monitoring and accurate implementation." *Id.* at 1364.

On June 21, 2017, MVP responded to the Forest Service's concerns with the second draft of the Hydrologic Report, and submitted a third and final Hydrologic Report. *See* J.A. 1374–81 (response to comments), 1384–1420 (final draft), 1422–37 (appendix with methods used in final analysis). As to the Forest Service's sedimentation concerns, MVP sent the Forest Service copies of the following studies: *The Performance Evaluation of Two Silt Fence Geosynthetic Fabrics During and After Rainfall Event*, the 2014 Master's thesis mentioned above by Gregg Steven Dubinski; a turbidity monitoring study completed by the United States Geological Survey; details regarding site specific erosion control measures along Craig Creek; and "additional details supporting various aspects of the analysis." J.A. 1377–78. It also responded to the Forest Service comments as follows:

- The 79% containment value: The studies provided to the Forest Service "use both field and laboratory investigations . . . to provide a range of efficiencies that are reasonably attainable. The 79% containment is not the best-case scenario, but rather the mean reported value for both silt fences and compost filter socks, two predominant controls proposed to be used on the [pipeline right of way]." J.A. 1378.

- The 10% sedimentation threshold value: The Hydrologic Report "explains that no nationally accepted sedimentation standard or exceedance threshold for sediment is available. The level of 10 percent was chosen because it was a commonly used impact threshold for sediment metrics in a review conducted by the [EPA]. Additional detail is provided in Section 2.6 of the [Hydrologic Report]." J.A. 1381. Section 2.6 of the third Hydrologic Report, in turn,

17

contains a soil loss and sediment delivery analysis, and explains that "[f]rom a sensitive-species perspective, a 10 percent increase over background would likely be within the normal variance experienced in a stream system" and "natural variation in streams is relatively high"; thus, "detecting sediment increases in streams is fairly difficult." *Id*. at 1405.

The very next day, June 22, 2017, FERC released the EIS, which incorporated and relied upon the second draft of the Hydrologic Report.[8] Specifically, the EIS stated the following:

- In the commentary process, the Forest Service expressed concern "regarding the potential for increased sedimentation caused by erosion of exposed soil . . . to affect the waterbodies crossed by the [pipeline] within the Jefferson National Forest and impact downstream resources." J.A. 234.

- To address these concerns, MVP "commissioned a sedimentation model to assess the extent of sedimentation that could occur during construction within [certain] subwatersheds that intersect the Jefferson National Forest boundaries and the project area." J.A. 234–35.

- This "model" resulted in the conclusion that catchments in certain subwatersheds "would likely experience increases in sediment yield over baseline conditions during construction, restoration, and operation." J.A. 235. Such sedimentation "would likely be transported into downstream waterbodies." *Id*.

- The model also indicated that "construction could increase sedimentation, when accounting for [MVP's] erosion and sediment control methods, by more than 10 percent along sections of Craig Creek and [certain other headwater

---

[8] The third and final draft of the Hydrologic Report became available on FERC's docket on June 30, 2017.

> streams and tributaries, and subwatersheds].” J.A. 235. Impacts on the streams would be “greatest during the active construction phase of the project.” *Id.*

- Although the Hydrologic Report suggested that sediment loads would reach a “new sediment equilibrium” of one percent or less increase in sediment load within approximately four to five years, it also predicted “a new sediment equilibrium in excess of 10 percent over baseline for streams within [two certain] subwatersheds.” J.A. 235.

Nearly six months later, the Forest Service issued its ROD, adopting the EIS, and presumably relying on the third and final Hydrologic Report. Of note, the Forest Service did not provide any discussion as to how its concerns with regard to the second draft had been alleviated, and did not explain how the EIS was an adequate statement even though it relied on the second draft, not the third. The ROD states merely, “Forest Service hydrology and aquatic biology specialists reviewed the [Hydrologic Report] and . . . enlisted expertise from local, certified consultants to validate results.” J.A. 1279.

b.

*Forest Service’s Adoption of the EIS’s Analysis*

The Forest Service may adopt FERC’s EIS only if it undertakes “an independent review of the [EIS]” and “concludes that its comments and suggestions have been satisfied.” 40 C.F.R. § 1506.3(c). It must also ensure that the EIS is “adequate” under NEPA regulations. *Id.* § 1506.3(a); *see also Hughes River Watershed*, 81 F.3d at 445 & n.6. Our responsibility is to “determine whether the [agency] has considered the relevant factors and articulated a rational connection between the facts found and the choice made.” *Balt. Gas & Elec. Co. v. Nat. Res. Def. Council, Inc.*, 462 U.S. 87, 105 (1983).

19

The agency's decision is arbitrary and capricious if it "entirely failed to consider an important aspect of the problem" or "offered an explanation for its decision that runs counter to the evidence before the agency." *Defs. of Wildlife*, 762 F.3d at 396 (internal quotation marks omitted).

i.

*Independent Review and Comments Satisfied?*

First, we discern no evidence that the Forest Service undertook the required independent review of the EIS's sedimentation analysis. Nor can we ascertain how the Forest Service concluded that its comments had been satisfied, especially after having expressed such grave concerns about the sedimentation impact and containment figures presented in the second draft of the Hydrologic Report. The Forest Service suggests the written comments from MVP after the second draft, and the Forest Service's ROD months later, demonstrate that the concerns had been alleviated. *See* Resp'ts' Br. 38. MVP counsel likewise explained at oral argument, "[T]he court can certainly discern the rationale" for the Forest Service's ultimate acquiescence to the 79% figure. Oral Argument at 39:37–40, *Sierra Club v. Forest Service*, No. 17-2399 (May 8, 2018) (hereinafter "Oral Argument"); *see also* Intervenor's Br. 19.

But we certainly *cannot* discern the Forest Service's rationale because, as MVP counsel admitted at argument, "[The Forest Service] doesn't say in the record specifically that [its proposed 48% figure] is incorrect." Oral Argument at 39:33–36. Indeed, the Forest Service expressed nothing but skepticism of the 79% figure for more than three months. In fact, the Forest Service proposed the 48% figure as a ceiling, rather than a

20

floor or even a desired target, for sediment containment. *See* J.A. 1361 (proposing a figure "equal to or less than 48% containment"). Given the circumstances, we simply cannot conclude that the Forest Service undertook an independent review and determined that its comments and concerns were satisfied when it shifted from a 48% ceiling to 79% with absolutely no explanation. *See* 40 C.F.R. § 1506.3(c). This shift is particularly concerning in light of MVP's commentary at the May 9 meeting that using the 48% figure would have "ramifications for the entire project analysis." *Id.* at 1363. MVP's counsel attempted to curb this statement at argument. *See* Oral Argument at 35:55–36:01 (The "ramifications . . . would be to challenge basic practice for dealing with construction related impacts."). But a more logical way to interpret the statement is that MVP was troubled that using the 48% figure would undercut other studies and numbers supporting the project, causing the entire project to fail or be delayed.

Moreover, MVP's June 21, 2017 comments do not support the Forest Service's change in position. For example, in response to concerns about the 79% containment figure, MVP states that the figure "is not the best-case scenario, but rather the mean reported value for both silt fences and compost filter socks, two predominant controls proposed to be used on the [pipeline right of way]." J.A. 1384. Significantly, the Forest Service already knew this. *See id.* at 311 (second draft of Hydrologic Report: "Th[e] [79%] value is chosen because it is the mean reported value for both silt fences and compost filter socks."). In response to both the 79% figure and the 10% sedimentation impact threshold, MVP's June 21 comments list the Dubinski thesis, one government turbidity study, "details" about erosion control on Craig Creek, and "additional support"

21

that MVP provided to the Forest Service to further explain its rationale. *Id.* at 1368–69, 1372. But critically, the Forest Service ROD does not explain how these materials support the metrics used in the Hydrologic Report, or how they assuage the Forest Service's earlier concerns about TES in the above-threshold subwatersheds.

As to the 10% figure for sediment increase above baseline measures, the EIS explains that even when "accounting for [MVP's] erosion and sediment control methods," construction could increase sedimentation "*by more than 10 percent* along sections of Craig Creek and [other certain headwater streams, tributaries, and subwatersheds]." J.A. 235 (emphasis supplied). The EIS also explains that "a new sediment equilibrium *in excess of 10 percent* over baseline for streams within [two certain] subwatersheds" would occur as a result of the project. *Id.* (emphasis supplied). Yet the Forest Service does not address these points in adopting the EIS, even though it earlier explained that (1) "organisms respond differently to increases in sedimentation, and a 10% impact threshold to determine when impacts would occur is likely not relevant," *id.* at 1357–58; and (2) if increase in sediment load leads to "impacts to sensitive species," the Forest Service "must analyze the significance of adverse effects on the populations, its habitat, and on the viability of the species as a whole," *id.* at 1362. Indeed, the Forest Service asked MVP to further evaluate the *impacts* on TES of less than 10% over the sedimentation baseline, but in response, MVP simply stated that a 10% increase "would likely be within the normal variance experienced in a stream system," and "detecting sediment increases in streams is fairly difficult." J.A. 1405.

22

*Remand to the Forest Service*

Pursuant to NEPA, we conclude the Forest Service acted arbitrarily and capriciously in adopting the sedimentation analysis in the EIS. It did not "articulate[] a rational connection between the facts found and the choice made." *Balt. Gas & Elec.*, 462 U.S. at 105. By MVP counsel's own admission, there is no statement in the ROD explaining the Forest Service's abandonment of its earlier concerns. *See* Oral Argument at 39:33–36 ("[The Forest Service] doesn't say in the record specifically that [its proposed 48% figure] is incorrect."). Its decision also "runs counter to the evidence before the agency." *Defs. of Wildlife*, 762 F.3d at 396 (internal quotation marks omitted). Leading up to the filing of the EIS, the Forest Service expressed steadfast concerns about the figures proposed by the Hydrologic Report. But it is not clear whether and how MVP's comments and the studies and reports it provided to the Forest Service alleviated those concerns. Finally, FERC incorporated the second draft of the Hydrologic Report in the EIS, even though the third and final draft was issued the previous day. There is also no indication FERC considered the third draft at all, yet the Forest Service adopted the EIS anyway.

Upon remand, the Forest Service should explain its assent to the 79% and 10% figures, and also explain how the EIS took a "hard look" at the sedimentation issues discussed here considering its reliance on a superseded report with which the Forest Service had grave concerns. If supplemental analysis is needed, i.e., regarding the effect of aquatic TES, the agency should perform that analysis as well.

2.

*Forest Effects*

Petitioners also contend that the BLM and Forest Service violated NEPA because, in adopting the EIS, they did not consider the impact on the forests in considering alternative routes and plans. For example, they argue the BLM and the Forest Service did not consider whether the core forests through which the right of way passes would still be part of a contiguous forest patch, or whether alternative routes "would reduce visual or scenic impacts." Pet'rs' Br. 40. They claim "[m]ore nuanced analyses could have addressed other elements of forest quality, such as the shape or 'depth' of forest patches." *Id.* at 36. Thus, Petitioners contend the BLM and Forest Service did not recognize that the EIS "fails to justify its conclusion" that none of the alternative routes offers a significant environmental advantage. *Id.* at 43.

We conclude that Petitioners have not met their "demanding burden" on this issue. *Almy v. Sebelius*, 679 F.3d 297, 307 (4th Cir. 2012). NEPA requires that agencies reasonably evaluate a right of way's impacts on forests and "candidly acknowledge[] its risks." *Webster v. U.S. Dep't of Agric.*, 685 F.3d 411, 429 (4th Cir. 2012). "It is of course always possible to explore a subject more deeply and to discuss it more thoroughly." *Coal. on Sensible Transp., Inc. v. Dole*, 826 F.2d 60, 66 (D.C. Cir. 1987). The BLM and the Forest Service, through their respective RODs, sufficiently explained their methodology and identified the competing factors they weighed in reaching their conclusion. They also considered viable alternatives and explained why they are not appropriate.

24

The agencies likewise did not "entirely fail[] to consider an important aspect of the problem." *Defs. of Wildlife*, 762 F.3d at 396. The EIS indicated that the proposed right of way would transform approximately 336 acres of adjacent "interior forest" habitat into "forest edge" habitat.[9] J.A. 210. The EIS noted that interior forest "has a higher habitat value for some wildlife species, and is generally considered rarer than forest edges which have lower habitat value for many species and can be created immediately with disturbance." *Id.* at 195. It also discussed the pipeline's potential to fragment interior forests. *See id.* at 224–26. A diagram in the EIS also demonstrates that the proposed right of way would transect three core forests that Virginia has rated as having "outstanding" or "very high" ecological value. *Id.* at 199.

The EIS and the BLM's ROD also discuss four alternatives to the proposed pipeline route, and they specifically address the impact on forest fragmentation. For example, Alternative 1, which would be collocated with existing electrical transmission lines for around 70 more miles than the proposed route, also "crosses 1.9 fewer miles of [National Forest Service] lands, . . . and would impact less interior forest" compared to the proposed route. J.A. 604. However, it would also be 20 miles longer, "potentially disturbing 336 more acres, and 90 more parcels." *Id.* Hybrid Alternative 1A, which would cross the forest in a different location, would "be substantially collocated with various overhead electric transmission lines," and would cross 1.8 fewer miles of the

_____

[9] "Interior forest" is defined in the EIS as "forested areas greater than 300 feet from the influence of forest edges or open habitat." J.A. 195.

Jefferson National Forest and five fewer miles with landslide potential. But it would also increase the length of the pipeline by six miles, affect 28 more landowners, and cross 22 more perennial streams and two more major waterbodies. *Id.* Hybrid Alternative 1B would reduce impacts on interior forests, but would increase the length of the pipeline by almost 15 miles and increase the "overall project disturbance." *Id.* at 605. And the Atlantic Coast Pipeline Collocation Alternative, which would involve the installation of the MVP pipeline adjacent to the proposed pipeline route for the Atlantic Coast pipeline project, would affect less interior and old growth forest compared to the proposed route. But that option would cross 15.6 more miles of Forest Service land, and in many areas, there is insufficient space to run the pipelines beside each other, so construction would require side slope construction techniques and additional acres of disturbance. The EIS also discussed how collocation is desirable because it reduces forest fragmentation. *See id.* at 225 (explaining that collocating the pipeline with an existing right of way "reduces the amount of fragmentation and new edges by shifting the existing forest edge as opposed to creating a completely new corridor").

As for visual impact, the agencies considered this as well, including "potential visual impacts . . . both at the [Appalachian Trail] crossing location and from more distant viewpoints." J.A. 152. The EIS acknowledged, however, that a "buffer of undisturbed forest on either side of the trail . . . would substantially reduce visual impacts." *Id.* at 153. The EIS also recognized "[o]ther visual effects could result from the removal of large individual trees that have intrinsic aesthetic value." *Id.* at 259. But

26

it also explained measures for 'minimizing visual effects" and "reducing long-term impacts of the permanent right-of-way." *Id.* at 271.

In sum, perhaps the agencies' analysis could have been more "nuanced," but the agencies did not "entirely fail[] to consider an important aspect of the problem," and their decision was not "implausible." *Defs. of Wildlife.*, 762 F.3d at 396. We thus defer to the agencies' conclusions on the issue of forest effects.

3.

*Meaningful Analysis*

As explained above, an agency may only adopt an EIS if it "meets the standards for an adequate [EIS]" under NEPA regulations. 40 C.F.R. § 1506.3(a). One applicable regulation applies to Draft Environmental Impact Statements ("DEIS") and provides:

> If a [DEIS] is so inadequate *as to preclude meaningful analysis*, the agency shall prepare and circulate a revised draft of the appropriate portion. The agency shall make every effort to disclose and discuss at appropriate points in the [DEIS] all major points of view on the environmental impacts of the alternatives, including the proposed action.

40 C.F.R. § 1502.9(a) (emphasis supplied). In addition, "[n]o material may be incorporated by reference unless it is reasonably available for inspection by potentially interested persons within the time allowed for comment." *Id.* § 1502.21. Petitioners contend that the DEIS precluded meaningful comment because (1) it failed to address the efficacy of MVP's Erosion and Sediment Control Plan (the "Control Plan"); (2) its description of the project's *purpose* and *need* precluded meaningful analysis; (3) it did not adequately analyze or weigh impacts on forests. *See* Pet'rs' Br. 25–29. Therefore,

27

Petitioners' claim, the agencies should not have adopted the EIS. We reject each of these arguments.

a.

*Time for Comment*

First, a DEIS must not be "so inadequate as to preclude meaningful analysis," and any referenced material should be made available "within the time allowed for comment." 40 C.F.R. §§ 1502.9(a), 1502.21. The Control Plan was publicly available on the FERC docket during the DEIS comment period. Indeed, Petitioners filed six pages of comments on sedimentation issues at the DEIS stage, including a critique of the Control Plan itself. Petitioners have not demonstrated that "omissions in the DEIS left the public unable to make known its environmental concerns about the project's impact." *Nat'l Comm. for the New River v. FERC*, 373 F.3d 1323, 1329 (D.C. Cir. 2004).

b.

*Project's Purpose*

Second, a DEIS "shall briefly specify the underlying purpose and need to which the agency is responding in proposing alternatives including the proposed action." 40 C.F.R. § 1502.13. We have explained, "The statement of a project's purpose and need is left to the agency's expertise and discretion, and we defer to the agency if the statement is reasonable." *All. for Legal Action v. F.A.A.*, 69 F. App'x 617, 622 (4th Cir. 2003) (per curiam) (citing *Friends of Se.'s Future v. Morrison*, 153 F.3d 1059, 1066–67 (9th Cir. 1998)). We further explained that we should consider "the nature of the proposed federal action" informed by "the project sponsor's goals," as well as "the goals that Congress has

28

set for the agency." *Id.* On the flip side, "a purpose is unreasonable when the agency defines it so narrowly as to allow only one alternative from among the environmentally benign ones in the agency's power, such that the EIS becomes essentially a foreordained formality." *Webster*, 685 F.3d at 422 (internal quotation marks omitted). It may also be unreasonable "if the agency draws [the purpose] so broadly that an infinite number of alternatives would accomplish" the project's goals. *Id.* (internal quotation marks omitted).

Here, the DEIS explained:

> In general, as described by the Applicants, the purpose of . . . the MVP . . . is to transport natural gas produced in the Appalachian Basin to markets in the Northeast, Mid-Atlantic, and Southeastern United States. Specifically, the MVP would deliver the identified gas volumes (2 Bcf/d) to five contracted shippers via a pooling point at Transco Station 165 in Pittsylvania County, Virginia . . . .

J.A. 4. It is not clear whether Petitioners are arguing that this statement is too narrow or too broad. Nonetheless, we conclude the statement allows for a wide range of alternatives but is narrow enough (i.e., it explains where the gas must come from, where it will go, how much it would deliver) that there are not an infinite number of alternatives. It also reflects the goals Congress set forth in the Natural Gas Act, which bestows upon FERC the "power to perform any and all acts . . . to carry out the provisions of" the NGA in the transportation of natural gas in interstate commerce. 15 U.S.C. § 717*o*; *see also id.* § 717(b). Although Petitioners would like more detail, specifically about the precise final destination of the gas transported through the pipeline,

29

they have not sufficiently explained how the absence of that detail precluded meaningful analysis of the DEIS.

c.

*Opportunity to Respond*

Third, Petitioners also believe the DEIS did not adequately analyze or weigh impacts on forests, and they lacked a meaningful opportunity to respond to an impacts analysis. However, the DEIS does discuss the project's potential to convert interior forest to edge forest and to fragment interior forests. *See*, *e.g.*, J.A. 3, 38–44, 47–49. Indeed, Petitioners and others submitted detailed comments on these edge effects and fragmentation. *See, e.g., id.* at 471–75. Clearly, then, there was an opportunity for meaningful comment and review, and Petitioners took advantage of it.

4.

*Alternatives*

Petitioners' next NEPA argument is that the Forest Service's ROD is deficient because it does not discuss all alternatives examined in FERC's EIS. Rather, it "unlawfully limited its analysis to only two alternatives: MVP's proposal and the 'no action' alternative." Pet'rs' Br. 60 (citing J.A. 1291). Petitioners claim "[t]his cabined analysis violates the Forest Service's obligation to 'rigorously explore and objectively evaluate *all reasonable alternatives*.'" *Id.* at 60–61 (quoting 40 C.F.R. § 1502.14(a)) (emphasis in brief).

NEPA regulations require that a ROD "[i]dentify all alternatives considered by the agency in reaching its decision, specifying the alternative or alternatives which were

30

considered to be environmentally preferable." 40 C.F.R. § 1505.2(b). The EIS shall "[r]igorously explore and objectively evaluate all reasonable alternatives," and "[d]evote substantial treatment to each alternative considered in detail including the proposed action so that reviewers may evaluate their comparative merits." *Id*. § 1502.14(a), (b). Here, while the Forest Service ROD does not have a separate section addressing alternatives, it nonetheless adopts the EIS's conclusion that the "proposed route minimizes the totality of impacts across federal and non-federal lands," J.A. 1288, and "[t]he alternatives and variations considered were either not technically feasible or did not result in significant environmental advantage over the corresponding proposed route," *id*. at 1289.

NEPA regulations require the EIS -- not the ROD -- to "[r]igorously explore and objectively evaluate all reasonable alternatives" to the proposed action. 40 C.F.R. § 1502.14(a). Therefore, the Forest Service did not act arbitrarily in failing to tick through each alternative and the reasons for rejecting them. By adopting the EIS and rendering its decision, it sufficiently "identified" all alternatives considered and "specified" that the preferred route was environmentally preferable. *Id.*. § 1505.2(b). In the end, the Forest Service was tasked with determining whether to amend its Forest Plan, and whether to join in the BLM's decision to grant a right of way. It was *not* tasked with approving the project as a whole -- nor could it be under the Natural Gas Act. Therefore, this argument fails.

Petitioners also contend that the Forest Service and the BLM acted arbitrarily by "conclud[ing] that the no action alternative would not offer environmental benefits."

31

Pet'rs' Br. 63. But the premise underlying this argument is false. In fact, the EIS acknowledges that "[c]ompared to the proposed action, the no action alternative would offer a *significant* environmental advantage." J.A. 116 (emphasis supplied). We reject this argument as well.

B.

*The National Forest Management Act*

We turn next to Petitioners' arguments under the NFMA. This Act "establishes a two-step procedure for managing National Forest System lands." *Am. Wild Horse Pres. Campaign v. Perdue*, 873 F.3d 914, 919 (D.C. Cir. 2017). First, the Forest Service must "develop, maintain, and, as appropriate, revise [Forest Plans]," which provide a framework for where and how certain activities can occur in national forests. *Id*. (quoting 16 U.S.C. § 1604(a)); *see also Sierra Club v. Robertson*, 28 F.3d 753, 758 (8th Cir. 1994). Second, the Forest Service must "ensure that all '[r]esource plans and permits, contracts, and other instruments for the use and occupancy of National Forest System lands' . . . are 'consistent with the Forest Plans.'" *Id*. (quoting 16 U.S.C. § 1604(i)) (alteration omitted).

The NFMA also provides a process for developing, revising, and amending Forest Plans. It charges the Department of Agriculture with promulgating guidelines for Forest Plans, which should, inter alia, "insure consideration of the economic and environmental aspects of various systems of renewable resource management," and "provide for diversity of plant and animal communities based on the suitability and capability of the specific land area." 16 U.S.C. § 1604(g)(3)(A)–(B).

32

1.

*The 2012 Planning Rule*

Under the authority bestowed by the NFMA, the Forest Service has promulgated regulations for all Forest Plans. *See* 36 C.F.R. § 200.3(b) (Secretary of Agriculture delegating authority under the NFMA to the Forest Service). In 2012, the Forest Service issued the regulations at the heart of this appeal. *See* Nat'l Forest Sys. Land Mgmt. Planning, 77 Fed. Reg. 21162 (April 9, 2012) (the "2012 Planning Rule"). The 2012 Planning Rule allows forest plans to be amended "at any time." 36 C.F.R. § 219.13(a). When promulgated, the 2012 Planning Rule stated that amendments to forest plans should occur "consistent with the Forest Service NEPA procedures." *Id*. § 219.13(b)(3) (2012). But it did not elaborate further, which led to "confusion about how responsible officials should apply the substantive requirements for sustainability, diversity, multiple use and timber set forth in [the 2012 Planning Rule] when amending [earlier] plans." Nat'l Forest Sys. Land Mgmt. Planning, 81 Fed. Reg. 70373-01, at 70374–75 (Oct. 12, 2016).

To resolve this confusion, the Forest Service further revised portions of the 2012 Planning Rule in 2016 (the "2016 Revisions").[10] Specifically, the 2016 Revisions provide that the Forest Service "shall . . . [d]etermine which specific substantive requirement(s) within §§ 219.8 through 219.11 are *directly related* to the plan direction

[10] The 2016 Revision took effect Jan. 17, 2017, after initiation of the proceedings at issue here. The Forest Service agrees that its final decision was required to comply with the revised rule. *See* J.A. 1272.

being added, modified, or removed by the amendment," and then "apply such requirement(s) within the scope and scale of the amendment." 36 C.F.R. § 219.13(b)(5) (emphasis supplied). Conversely, "[t]he responsible official is not required to apply any substantive requirements within §§ 219.8 through 219.11 that are not *directly related* to the amendment." *Id*. (emphasis supplied).

Thus, the issue we consider here turns on whether the requirements in the 2012 Planning Rule are *directly related* to the instant Forest Service amendments to the Jefferson Forest Plan.

2.

*The Jefferson Forest Plan Amendments*

In its ROD, the Forest Service explained that it decided to amend the Jefferson Forest Plan standards, but only for the limited purpose of construction and operation of the MVP pipeline. It made amendments in five categories to accommodate the project: (1) utility corridors; (2) soil and riparian; (3) old growth management; (4) Appalachian Trail area; (5) and scenic integrity.[11] *See* J.A. 1274–76. For example, following is an amendment set forth in the Forest Service ROD, with the bold language applicable only for purposes of the MVP pipeline project:

> Standard FW-5: On all soils dedicated to growing vegetation, the organic layers, topsoil and root mat will be left in place over at least 85% of the activity area and revegetation is accomplished within 5 years, **with the exception of the operational right-of-way and the construction zone for the**

---

[11] Petitioners only challenge the soil and riparian category on this issue.

34

> **Mountain Valley Pipeline, for which the applicable [MVP
> proposed] mitigation measures . . . must be implemented.**

*Id.* at 1274. There are similar Forest Plan standards from which the MVP project is exempt, including: (1) no heavy equipment can be used on plastic soils when the water table is within 12 inches of the surface or when soil moisture exceeds the plastic limit;[12] (2) heavy equipment is operated so that soil indentations, ruts, or furrows are aligned on the contour, and the slope of such indentations is 5% or less; (3) management activities expose no more than 10% mineral soil in the channeled ephemeral zone;[13] (4) management activities expose no more than 10% mineral soil within the project area riparian corridor.[14]

---

[12] Plastic soils are soils that exhibit plastic properties and "will deform without shearing (typically silts or clays)." Plastic Soil, *Vocabulary Catalog*, Environ. Prot. Agency, https://iaspub.epa.gov/sor_internet/registry/termreg/searchandretrieve/glossaries andkeywordlists/search.do?details=&vocabName=UST%20Technical%20Terms, Page 5 of 7 (enclosed as PDF attachment).

[13] An ephemeral stream "has flowing water only during, and for a short duration after, precipitation events in a typical year. Ephemeral stream beds are located above the water table year-round. Groundwater is not a source of water for the stream. Runoff from rainfall is the primary source of water for stream flow." Ephemeral Stream, *Glossary*, Environ. Prot. Agency, https://www.epa.gov/sites/production/files/2016-02/documents/realestate_glossary.pdf (enclosed as PDF attachment).

[14] Riparian areas are "lands adjacent to streams, lakes, and estuarine-marine shorelines. Riparian areas are transitional between terrestrial and aquatic ecosystems, through which surface and subsurface hydrology connects water bodies with their adjacent uplands." Riparian, *Glossary*, Environ. Prot. Agency, https://www.epa.gov/sites/production/files/2016-02/documents/realestate_glossary.pdf (enclosed as PDF attachment). A riparian corridor, on the other hand, is a Forest Service designated prescription area that includes the area in and around water, including the highest water mark and around the perimeter of the water source. *See* Forest Service, (Continued)

3.

*"Directly Related"*

Having set forth the amendments to the Jefferson Forest Plan, we must now look to whether the 2012 Planning Rule substantive requirements are "directly related" to the plan direction added or modified by those amendments. 36 C.F.R. § 219.13(b)(5).

a.

*Proper Analysis*

In undertaking the "directly related" analysis, an agency's "determination must be based on the purpose for the amendment *and* the effects (beneficial or adverse) of the amendment, and informed by the best available scientific information, scoping, effects analysis, monitoring data or other rationale." 36 C.F.R. § 219.13(b)(5)(ii) (emphasis supplied). In the ROD, the Forest Service states that some 2012 Planning Rule soil and riparian substantive requirements are "*relevant* to th[e] [Jefferson Forest Plan] amendment": for example, soil and soil productivity; water resources in the plan area; ecological integrity of riparian areas. J.A. 1287 (emphasis supplied). But it nonetheless concludes they were not "directly related" to the Planning Rule because, with proposed mitigation measures in the plan of development and project design, which "will minimize adverse environmental impacts to soils and water resources and riparian areas," the amendment will not cause "substantial adverse effects" or "a substantial lessening of

*Definition of Riparian Corridor*, https://www.fs.usda.gov/Internet/FSE_DOCUMENTS/ stelprd3834599.pdf (enclosed as PDF attachment).

36

protections" to soil and water. *Id.*

With regard to the directly related analysis, the Department of Agriculture itself has explained, "When a specific substantive requirement is associated with *either* the purpose for the amendment *or* the effects (beneficial or adverse) of the amendment, the responsible official must apply that requirement to the amendment." Nat'l Forest Sys. Land Mgmt. Planning, 81 Fed. Reg. 90723-01, 90731 (Dec. 15, 2016) (emphasis supplied). We conclude that the only way to read this statement, along with § 219.13(b)(5)(ii), is to require the agency to look to both the purpose and effect of the amendment, and if the substantive requirement at issue (i.e., soil, water) is based upon or associated with either one, it is *directly related*.

In its ROD here, however, the Forest Service failed to analyze the purpose of the amendment. Instead, it only analyzed the effects of the amendment. This is an improper interpretation of a decidedly unambiguous regulation -- one that, as noted directly above, the Department of Agriculture had already interpreted to the contrary -- and thus, the Forest Service analysis here is entitled to no deference. *See Auer v. Robbins*, 519 U.S. 452, 461 (1997) (review of agency's interpretation of its own regulation "controlling unless plainly erroneous or inconsistent with the regulation" (internal quotation marks omitted)); *see also Ohio Valley Envtl. Coal. v. Aracoma Coal* Co., 556 F.3d 177, 193 (4th Cir. 2009) ("In applying . . . *Auer* deference . . . we must first determine whether the regulation itself is unambiguous; if so, its plain language controls." (internal quotation marks omitted)).

37

## b.

### *Purpose of the Amendment*

Thus, we look to the purpose of the amendment, which is determined by "the need to change the plan." 36 C.F.R. § 219.13(b)(1); *see also* 81 Fed. Reg. at 90,731. A "responsible official" is required to identify that need, 36 C.F.R. § 219.13(b), and the record is clear that the Forest Service has already done this. The Forest Service admittedly needed to change the Forest Plan because the MVP project could not meet its requirements otherwise. *See* J.A. 1280 ("The amendment [to the Forest Plan] is needed because the MVP Project cannot achieve several *Forest Plan standards* that are intended to protect *soil, water, [and] riparian . . . resources.*" (emphasis supplied)). Of note, elsewhere in the ROD, the Forest Service characterizes the purpose of the amendment as "ensur[ing] consistency between provisions of the Forest Plan and the proposal to construct, operate, and maintain [the pipeline] on National Forest System land." J.A. 1284. But there would be no need to "ensure consistency" if the Forest Plan need not be amended in the first place. Thus, the clear purpose of the amendment is to lessen requirements protecting soil and riparian resources so that the pipeline project could meet those requirements.

Having determined the purpose of the amendment, it is clear the Planning Rule sets forth substantive requirements *directly related* to that purpose: "soil and soil productivity" (36 C.F.R. § 219.8(a)(2)(ii)); "water resources" (36 C.F.R. § 219.8(a)(2)(iv)); "the ecological integrity of riparian areas" (36 C.F.R. § 219.8(a)(3)(i)). Therefore, there is no question that the 2012 Planning Rule requirements for soil, water,

38

and riparian resources are *directly related* to the purpose of the Forest Plan amendment. The Forest Service acted arbitrarily and capriciously in concluding otherwise.

c.

*Remand to the Forest Service*

Because the soil and riparian Planning Rule requirements are *directly related* to the amendments to the Jefferson Forest Plan, the agency is required to "apply [those] requirement[s] within the scope and scale of the amendment." 36 C.F.R. § 219.13(b)(5). At base, this means that the Forest Service is required to ensure that amendments to the soil and riparian standards in the Jefferson Forest Plan will comply with the NFMA and attendant regulations. The Forest Service claims this would be an exercise in futility, as the record already demonstrates that the mitigation measures proposed by MVP and agreed upon by FERC and the other agencies will ensure that there will be no substantial adverse effects to soil and water. However, as explained in our analysis of the Hydrologic Report, *supra*, the record does not support such a conclusion as a matter of law. We therefore remand to the Forest Service for proper application of the Planning Rule soil and riparian requirements to the Forest Plan amendment.

C.

*The Mineral Leasing Act*

Finally, we turn to Petitioners' argument that the BLM violated the MLA in its grant of the 3.6 mile right of way across federal land. The Natural Gas Act gives FERC the authority over construction and operation of interstate gas pipelines, but it does not limit or modify other agencies' authority or obligations. The MLA regulates the *location*

39

of interstate pipelines across most federal lands. *See* 30 U.S.C. § 185(a). This includes approving rights of way and easements for the siting of those pipelines. The BLM implements the right of way program to "[p]rotect[] the natural resources associated with Federal lands"; "[p]revent[] unnecessary or undue degradation to public lands"; and "[p]romote[] the use of rights-of-way in common." 43 C.F.R. § 2881.2(a)–(c).

1.

*Practicality*

The MLA provides, "In order to minimize adverse environmental impacts and the proliferation of separate rights-of-way across Federal lands, the utilization of rights-of-way in common *shall be required to the extent practical*." 30 U.S.C. § 185(p) (emphasis supplied). Petitioners contend the BLM violated its obligations because it "failed to demonstrate that alternatives that would make greater use of existing rights-of-way were impractical." Pet'rs' Br. 45 (emphasis supplied). We agree. Whereas the BLM's ROD adopted and incorporated the EIS's NEPA alternatives analysis on this issue, it nonetheless failed to recognize that the MLA imposes a higher and more specific bar.

The EIS "evaluate[d] a range of reasonable alternatives, as required by NEPA," explaining, "The purpose of this evaluation is to determine whether an alternative would be *preferable to the proposed action*." J.A. 113–14 (emphasis supplied). The EIS used the following criteria in considering whether an alternative was "preferable": (1) whether it met "the stated purpose of the project"; (2) whether it was "technically and economically feasible and practical"; and (3) whether it "offer[ed] a significant environmental advantage over [the] proposed action." *Id*. at 114. Importantly, the EIS

40

explained, "Ultimately, an alternative that results in equal or minor advantages in terms of environmental impact would not compel [FERC] to shift the impacts from the [set of landowners set to be affected by the proposed route] to a new set of landowners." *Id*.

Using this criteria, the EIS discussed alternative routes. For example, the Columbia Gas of Virginia ("CGV") Peters Mountain Variation would "follow existing rights-of-way . . . cross[ing] approximately 0.8 mile[s] of the Jefferson National Forest." J.A. 149. However, the EIS also explained that this route "would be about 9 miles longer than the comparable portion of the proposed route, and would result in approximately 136 additional acres of construction disturbance." *Id*. at 151. Thus, the EIS concluded that the CGV alternative route "*does not offer a significant environmental advantage* when compared to the corresponding proposed route." *Id*. at 152 (emphasis supplied). The BLM's ROD, like the EIS, considered whether alternatives "offer[ed] a significant environmental advantage over the proposed pipeline route." *Id*. at 603; *see also id.* at 607. Nowhere, however, does the BLM recognize the MLA's direction that the utilization of rights of way in common "shall be required to the extent practical." 30 U.S.C. § 185(p).

However, the BLM contends that its analysis is sufficient, explaining, "The comparative analysis in the EIS showed that alternative National Forest crossings along existing rights-of-way posed greater practical difficulties without yielding a significant environmental advantage." Resp'ts' Br. 16. Thus, by incorporating and adopting the EIS, the BLM fulfilled its statutory duty to utilize existing rights of way *when practical*. The BLM also argues it has wide discretion to decide, on a case-by-case basis, which

41

alternatives are practical. As support for its interpretation, it points to a BLM regulation providing that the agency "*may . . .* restrict new grants to existing right of way corridors *where safety and other considerations allow*." 43 C.F.R. § 2882.10(b) (emphases supplied). And as set forth in the EIS, with regard to alternatives, other factors outweighed the environmental benefits of utilizing existing rights of way.

We disagree with the BLM's analysis. The agency "entirely failed to consider an important aspect of the problem." *Defs. of Wildlife*, 762 F.3d at 396. It never decided that the utilization of an existing right of way would be *impractical*. Indeed, it never even purported to do so. Had the BLM done so, its analysis -- rather than favoring the proposed route by rejecting alternatives unless they were substantially better -- would have favored routes utilizing existing rights of way unless those alternatives were impractical.

Although the BLM did not make a practicability finding, we are not authorized to step in and do so on behalf of the agency, nor may we predict how the agency might have made such a finding. *See Michigan v. EPA*, 135 S. Ct. 2699, 2710 (2015) ("[A] court may uphold agency action only on the grounds that the agency invoked when it took the action." (citing *SEC v. Chenery Corp.*, 318 U.S. 80, 87 (1943))). We thus vacate the BLM's decision and remand for consideration of the MLA's preference for utilizing existing rights of way.

## 2.

### *Feasibility*

The MLA also requires the BLM to ensure that "activities in connection with the right-of-way or permit" comply with "facility siting standards established by or pursuant to law." 30 U.S.C. § 185(h)(2)(B). Petitioners state that one such facility siting standard is set forth in the Jefferson Forest Plan and requires that "[w]hen feasible, expansion of existing corridors and sites is preferable to designating new sites." Standard FW-247, J.A. 1238.

Petitioners read this standard as creating an obligation upon the BLM to demonstrate that collocation with existing rights of way is *infeasible*. But the siting standard does not appear to apply to the ROD's determination of the proper *route* for a right of way. Rather, it dictates that the *right of way grant* would "ensure that activities in connection with" the right of way abide by siting standards. *See* 43 C.F.R. § 2885.11(b)(9)(ii) (providing that applicants who receive a right of way grant from the BLM must, "[d]uring construction, operation, maintenance, and termination of the project," "[e]nsure that activities in connection with the grant . . . comply with . . . facility siting standards"); *see also* J.A. 572 (BLM ROD stating that approval of the right of way is "subject to terms, conditions, stipulations, and environmental protection measures" developed by the Forest Service, which would include the Jefferson Forest Plan). Accordingly, the BLM is not required to show that siting alternatives are infeasible under the MLA.

43

IV.

MVP's proposed project would be the largest pipeline of its kind to cross the Jefferson National Forest.  American citizens understandably place their trust in the Forest Service to protect and preserve this country's forests, and they deserve more than silent acquiescence to a pipeline company's justification for upending large swaths of national forestlands.  Citizens also trust in the Bureau of Land Management to prevent undue degradation to public lands by following the dictates of the MLA.

As a result, for the reasons set forth herein, we grant the petition for review of the Forest Service Rule of Decision and vacate that decision.  We also grant the petition for review of the BLM's Rule of Decision and vacate that decision.  We remand to the respective agencies for proceedings consistent with this opinion.

*PETITIONS FOR REVIEW GRANTED,*
*VACATED AND REMANDED*