**PUBLISHED**

UNITED STATES COURT OF APPEALS
FOR THE FOURTH CIRCUIT

———————————

**No. 21-1039**

———————————

WILD VIRGINIA; SIERRA CLUB; APPALACHIAN VOICES; WILDERNESS SOCIETY; PRESERVE CRAIG; SAVE MONROE; INDIAN CREEK WATERSHED ASSOCIATION,

Petitioners,

v.

UNITED STATES FOREST SERVICE, an agency of the U.S. Department of Agriculture; JIM HUBBARD, in his official capacity as Under Secretary for Natural Resources and Environment, United States Department of Agriculture; KEN ARNEY, in his official capacity as Regional Forester of the Southern Region,

Respondents,

MOUNTAIN VALLEY PIPELINE, LLC,

Intervenor.

------------------------------

CHEROKEE FOREST VOICES; GEORGIA FORESTWATCH; MOUNTAINTRUE; THE CLINCH COALITION; VIRGINIA WILDERNESS COMMITTEE,

Amici Supporting Petitioner.

AMERICAN FOREST RESOURCE COUNCIL; BLACK HILLS FOREST RESOURCE ASSOCIATION; COLORADO TIMBER INDUSTRY ASSOCIATION; FEDERAL FOREST RESOURCE COALITION; INTERMOUNTAIN FOREST ASSOCIATION; MONTANA WOOD PRODUCTS ASSOCIATION,

Amici Supporting Respondent.

On Petition for Review of an Order of the Department of Agriculture. (AGRI-1).

---

**No. 21-1082**

---

WILD VIRGINIA; SIERRA CLUB; APPALACHIAN VOICES; THE WILDERNESS SOCIETY; PRESERVE CRAIG; SAVE MONROE; INDIAN CREEK WATERSHED ASSOCIATION,

Petitioners,

v.

UNITED STATES BUREAU OF LAND MANAGEMENT, an agency of the U.S. Department of Interior; DEB HAALAND, in her official capacity as Secretary of the Interior; MITCHELL LEVERETTE, in his official capacity as State Director, Bureau of Land Management, Eastern States,

Respondents,

MOUNTAIN VALLEY PIPELINE, LLC,

Intervenor.

------------------------------

CHEROKEE FOREST VOICES; GEORGIA FORESTWATCH; MOUNTAINTRUE; THE CLINCH COALITION; VIRGINIA WILDERNESS COMMITTEE,

Amici Supporting Petitioner,

AMERICAN FOREST RESOURCE COUNCIL; BLACK HILLS FOREST RESOURCE ASSOCIATION; COLORADO TIMBER INDUSTRY ASSOCIATION; FEDERAL FOREST RESOURCE COALITION; INTERMOUNTAIN FOREST ASSOCIATION; MONTANA WOOD PRODUCTS ASSOCIATION,

Amici Supporting Respondent.

2

On Petition for Review of an Order of the Department of Interior.  (DOI-1).

Argued:  October 29, 2021                          Decided:  January 25, 2022

Before GREGORY, Chief Judge, and WYNN and THACKER, Circuit Judges.

Petitions granted in part and denied in part, vacated and remanded by published opinion. Judge Thacker wrote the opinion, in which Chief Judge Gregory and Judge Wynn joined.

**ARGUED:**  Nathan Matthews, SIERRA CLUB, Oakland, California, for Petitioners. Brian C. Toth, UNITED STATES DEPARTMENT OF JUSTICE, Washington, D.C., for Respondents.  Donald B. Verrilli, Jr., MUNGER, TOLLES & OLSON LLP, Washington, D.C., for Intervenor.  **ON BRIEF:**  Ankit Jain, SIERRA CLUB, Washington, D.C.; Derek O. Teaney, Benjamin Luckett, APPALACHIAN MOUNTAIN ADVOCATES, INC., Lewisburg, West Virginia, for Petitioners Wild Virginia, Sierra Club, Appalachian Voices, The Wilderness Society, Preserve Craig, Save Monroe, and Indian Creek Watershed Association.  William J. Cook, Special Counsel, CULTURAL HERITAGE PARTNERS, PLLC, Washington, D.C., for Petitioner Monacan Indian Nation.  Jean E. Williams, Acting Assistant Attorney General, Todd Kim, Acting Assistant Attorney General, Justin D. Hemminger, Environment and Natural Resources Division, UNITED STATES DEPARTMENT OF JUSTICE, Washington, D.C.; Michael D. Smith, Office of the Solicitor, UNITED STATES DEPARTMENT OF THE INTERIOR, Washington, D.C.; Sarah Kathmann, Office of the General Counsel, UNITED STATES DEPARTMENT OF AGRICULTURE, Washington, D.C., for Respondents.  George P. Sibley, III, J. Pierce Lamberson, Brian R. Levey, HUNTON ANDREWS KURTH LLP, Richmond, Virginia; Sandra A. Snodgrass, HOLLAND & HART LLP, Denver, Colorado; Thomas C. Jensen, Stacey M. Bosshardt, PERKINS COIE LLP, Washington, D.C., for Intervenor.  J. Patrick Hunter, Asheville, North Carolina, Spencer Gall, Kristin Davis, Gregory Buppert, SOUTHERN ENVIRONMENTAL LAW CENTER, Charlottesville, Virginia, for Amici Cherokee Forest Voices, Georgia ForestWatch, MountainTrue, The Clinch Coalition, and Virginia Wilderness Committee.  Lawson E. Fite, AMERICAN FOREST RESOURCE COUNCIL, Portland, Oregon, for Amici American Forest Resource Council, Black Hills Forest Resource Association, Colorado Timber Industry Association, Federal Forest Resource Coalition, Intermountain Forest Association, and Montana Wood Products Association.

3

THACKER, Circuit Judge:

In these two consolidated cases, several environmental advocacy organizations -- Wild Virginia, the Sierra Club, Appalachian Voices, the Wilderness Society, Preserve Craig, Save Monroe, and the Indian Creek Watershed Association (collectively, "Petitioners") -- seek review of the renewed decisions of the United States Forest Service (the "Forest Service") and the Bureau of Land Management (the "BLM") to allow the Mountain Valley Pipeline (the "Pipeline"), an interstate natural gas pipeline system, to cross three and a half miles of the Jefferson National Forest in Virginia and West Virginia. This is the second time Petitioners have challenged the agencies' approval of the Pipeline. We previously vacated the agencies' records of decision ("RODs") because the Forest Service and the BLM failed to comply with the National Environmental Policy Act ("NEPA"), the National Forest Management Act (the "NFMA"), and the Mineral Leasing Act (the "MLA"). We directed the agencies to re-evaluate certain aspects of the Pipeline's potential environmental impact. *Sierra Club, Inc. v. U.S. Forest Serv.*, 897 F.3d 582 (4th Cir. 2018).

Petitioners contend that the agencies' renewed RODs after remand also violate NEPA, the NFMA, and the MLA. As more fully explained below, we agree with Petitioners in part, so we grant their petitions as to three errors, deny the petitions with regard to Petitioners' remaining arguments, vacate the RODs of the Forest Service and the BLM, and remand for further proceedings consistent with this opinion.

4

I.

A.

Governing Statutory and Regulatory Framework

1.

NEPA

NEPA is a federal environmental protection statute that "declares a national policy of protecting and promoting environmental quality" and requires federal agencies to scrutinize the potential environmental impacts of their projects. *Hughes River Watershed Conservancy v. Glickman*, 81 F.3d 437, 443 (4th Cir. 1996); *see* 42 U.S.C. § 4331. Notably, NEPA does not require the agencies to reach particular substantive results. *Hughes River*, 81 F.3d at 443. Rather, NEPA imposes procedural requirements that obligate federal agencies "to undertake analyses of the environmental impact of their proposals and actions." *Dep't of Transp. v. Pub. Citizen*, 541 U.S. 752, 756–57 (2004) (citing *Robertson v. Methow Valley Citizens Council*, 490 U.S. 332, 349–50 (1989)). In order to accomplish this objective, NEPA mandates that federal agencies prepare an environmental impact statement ("EIS") as part of "every recommendation or report on proposals for . . . major Federal actions significantly affecting the quality of the human environment." 42 U.S.C. § 4332(2)(C). The primary purpose of an EIS is "to ensure agencies consider the environmental impacts of their actions in decision making." 40 C.F.R. § 1502.1. Accordingly, the EIS must analyze the proposed project's "significant environmental impacts" and discuss "reasonable alternatives that would avoid or minimize adverse impacts or enhance the quality of the human environment." *Id.* Of

5

note, "if significant new information or environmental changes come to light after the agency prepares an EIS," the agency must prepare a supplemental EIS to address them. *Save Our Sound OBX, Inc. v. N.C. Dep't of Transp.*, 914 F.3d 213, 218 (4th Cir. 2019) (citing 40 C.F.R. § 1502.9).

"Multiple agencies may cooperate to issue an EIS, but a 'lead agency' is usually designated." *Sierra Club, Inc. v. U.S. Forest Serv.*, 897 F.3d 582, 588 (4th Cir. 2018) (citing 7 C.F.R. § 3407.11(a)). The Federal Energy Regulatory Commission ("FERC") is the lead NEPA agency when the proposed project involves an interstate gas pipeline. *Id.* (citing 15 U.S.C. § 717n(b)(1); *EarthReports, Inc. v. FERC*, 828 F.3d 949, 953 (D.C. Cir. 2016)).

"[A]fter the agency makes a decision regarding the action [based on its consideration of the proposal's environmental impacts laid out in the EIS], it must publish a [ROD], at which point it may then finalize its action." *Webster v. U.S. Dep't of Agric.*, 685 F.3d 411, 418 (4th Cir. 2012) (citing *Nat'l Audubon Soc'y v. Dep't of the Navy*, 422 F.3d 174, 185 (4th Cir. 2005)); *see* 40 C.F.R. § 1505.2.

2.

The NFMA

The NFMA provides substantive and procedural guidance to the Forest Service for the management of National Forest System lands. Pursuant to the NFMA, the Forest Service "develops land and resource management plans" -- known as forest plans -- "and uses [them] to 'guide all natural resource management activities'" within the national forests. *Ohio Forestry Ass'n v. Sierra Club*, 523 U.S. 726, 729 (1998). To that end, "the

6

Forest Service must ensure that all resource plans and permits, contracts, and other instruments for the use and occupancy of National Forest System lands . . . are consistent with the Forest Plans." *Sierra Club*, 897 F.3d at 600 (alteration and internal quotation marks omitted); *see* 16 U.S.C. § 1604(i).  When a proposed project is not consistent with the applicable forest plan, the Forest Service must decide whether to modify the project to ensure consistency with the forest plan, reject the proposal or terminate the project, or amend the forest plan to accommodate the project.  36 C.F.R. § 219.15(c).

In 2012, pursuant to the NFMA, the Forest Service promulgated a rule governing amendments to forest plans (the "2012 Planning Rule").  *See* National Forest System Land Management Planning, 77 Fed. Reg. 21,162 (Apr. 9, 2012) (to be codified at 36 C.F.R. pt. 219).  The 2012 Planning Rule imposes "substantive requirements" for sustainability, diversity of plant and animal communities, multiple land uses, and timbering that are intended to "maintain or restore" ecological integrity and ecosystem diversity in national forests while preserving those forests for multiple uses.  *Id.*; *see* 36 C.F.R. §§ 219.8–219.11.  The 2012 Planning Rule further provides that a forest plan "may be amended at any time," 36 C.F.R. § 219.13(a), but it requires that any such amendment be "consistent with Forest Service NEPA procedures," *id.* § 219.13(b)(3).

Due to confusion about how to apply the 2012 Planning Rule's substantive requirements to forest plans developed pursuant to a 1982 forest planning rule with

7

different requirements,[1] the Forest Service revised its 2012 Planning Rule in 2016 (the "2016 Revised Rule"). *See* National Forest System Land Management Planning, 81 Fed. Reg. 90,723 (Dec. 16, 2016) (to be codified at 36 C.F.R. pt. 219). The 2016 Revised Rule requires the Forest Service, when amending a forest plan, to determine which "substantive requirements" of the 2012 Planning Rule are "directly related" to the forest plan amendment and "apply" those requirements "within the scope and scale of the amendment." 36 C.F.R. § 219.13(b)(5).

3.

The MLA

The MLA "authorizes the Secretary of the Interior to lease public-domain lands to private parties for the production of oil and gas." *BP Am. Prod. Co. v. Burton*, 549 U.S. 84, 87 (2006); *see* 30 U.S.C. § 185(a). "The MLA regulates the location of interstate pipelines across most federal lands," which "includes approving rights of way and easements for the siting of those pipelines." *Sierra Club*, 897 F.3d at 604 (emphasis deleted). "In order to minimize adverse environmental impacts and the proliferation of

---

[1] Forest plans developed pursuant to the 1982 forest planning rule are guided by fourteen overarching "principles," and in addition to procedural standards, the rule includes substantive standards for timbering, wilderness management, and resource preservation. 36 C.F.R. §§ 219.1–219.29 (1982), https://www.fs.fed.us/emc/nfma/includes/nfmareg.html. When proposing the 2012 Planning Rule, the Forest Service acknowledged that "most 1982 rule [forest] plans will not be consistent with all of the [substantive] requirements of the 2012 [P]lanning [R]ule." National Forest System Land Management Planning, 81 Fed. Reg. 70,373, 70,376 (proposed Oct. 12, 2016) (to be codified at 36 C.F.R. pt. 219).

8

separate rights-of-way across Federal lands," the MLA requires that rights of way in common be utilized "to the extent practical." 30 U.S.C. § 185(p).

When multiple federal agencies administer the federal lands traversed by an interstate pipeline, the MLA authorizes the Secretary of the Interior, "after consultation with the agencies involved, to grant or renew rights-of-way or permits through the Federal lands involved." 30 U.S.C. § 185(c)(2). The Secretary of the Interior has delegated her authority to the BLM. 36 C.F.R. § 251.54(b)(3) ("Proposals for oil and gas pipeline rights-of-way crossing Federal lands under the jurisdiction of two or more Federal agencies must be filed with the [BLM] . . . ."); 43 C.F.R. § 2884.26 ("If the application involves lands managed by two or more Federal agencies, BLM will not issue or renew [a right of way or temporary use permit] until the heads of the agencies administering the lands involved have concurred.").

B.

The Pipeline Project

The Pipeline, a project of Mountain Valley Pipeline, LLC ("MVP"), is planned to extend for more than 300 miles from Wetzel County, West Virginia, to Pittsylvania County, Virginia, upon its completion. On October 13, 2017, FERC issued a Certificate of Public Convenience and Necessity[2] (the "FERC Certificate") authorizing MVP to

---

[2] Pursuant to the Natural Gas Act, a natural gas company is prohibited from "engag[ing] in the transportation or sale of natural gas . . . or undertak[ing] the construction or extension of any facilities therefor, or acquir[ing] or operat[ing] any such facilities or extensions thereof, unless there is in force with respect to such natural-gas (Continued)

9

construct, operate, and maintain the Pipeline, new compressor stations, and new regulation stations and interconnections. Per NEPA, FERC also prepared an EIS for the Pipeline. The EIS purportedly considered the Pipeline's projected impact on geology and soils; groundwater, surface waters, and wetlands; vegetation and wildlife; land use and visual resources; socioeconomics and transportation; cultural resources; air quality and noise; and reliability and safety. It also purportedly analyzed the Pipeline's cumulative impacts and considered alternatives. Ultimately, FERC concluded that "construction and operation of the [Pipeline] would result in limited adverse environmental impacts, with the exception of impacts on forest" and that "approval of the [Pipeline] would result in some adverse environmental impacts, but the majority of these impacts would be reduced to less-than-significant levels." J.A. 2015.[3]

The Pipeline's projected route crosses a 3.5-mile swath of the Jefferson National Forest in Giles and Montgomery Counties in Virginia and Monroe County in West Virginia. This section of the projected route includes four stream crossings. In order to construct the Pipeline on these lands, MVP must obtain rights of way and temporary use permits from the BLM, in consultation with the Forest Service. The Pipeline must also be consistent with the forest plan developed by the Forest Service for the Jefferson

---

company a certificate of public convenience and necessity issued by [FERC] authorizing such acts or operations." 15 U.S.C. § 717f(c)(1)(A).

[3] Citations to the "J.A." refer to the Joint Appendix filed by the parties in this appeal.

10

National Forest (the "Jefferson Forest Plan"). The Jefferson Forest Plan "[e]stablishes the management direction and associated long-range goals and objectives of the Jefferson National Forest" and "[s]pecifies [certain] standards, which set the sideboards for achieving the goals, objectives and desired conditions, as well as provide meaningful direction when implementing projects" within the Jefferson National Forest. J.A. 1937. The Pipeline, as proposed, and as detailed more specifically below, would be inconsistent with 11 standards from five categories -- utility corridors, soil and riparian resources, old growth management areas, Appalachian National Scenic Trail areas, and scenery integrity objectives -- in the Jefferson Forest Plan.

C.

Prior Proceedings

In December 2017, the Forest Service, using FERC's EIS, initially decided to amend the Jefferson Forest Plan to accommodate the Pipeline but limit the amendments' applicability only to the Pipeline project. Consequently, the Forest Service's ROD modified 11 standards in the Jefferson Forest Plan that were inconsistent with the Pipeline project and waived 3 of those 11 standards. For example, the ROD relaxed one of the standards for soil and riparian resources as follows (with the modification in bold):

> Standard FW-5: On all soils dedicated to growing vegetation, the organic layers, topsoil and root mat will be left in place over at least 85% of the activity area and revegetation is accomplished within 5 years, **with the exception of the operational right-of-way and the construction zone for the Mountain Valley Pipeline, for which the applicable mitigation measures [MVP proposed] must be implemented.**

11

J.A. 2231 (emphasis in original). However, we vacated the Forest Service's ROD because the Forest Service did not conduct an "independent review" of the EIS's sedimentation analysis.[4] *Sierra Club*, 897 F.3d at 594. In addition, we rejected the Forest Service's conclusion that the soil and riparian resources requirements set forth in the 2012 Planning Rule were not "directly related" to the amendments to the Jefferson Forest Plan to accommodate the Pipeline, principally because the Forest Service itself acknowledged that those requirements could not be met absent the amendments. *Id.* at 603.

The BLM also initially adopted FERC's EIS and, "with the concurrence of the Forest Service and the [United States Army] Corps of Engineers . . . issued a [ROD] granting a 30 year, 50-foot operational right of way and associated temporary use permits" for the Pipeline's projected route through the Jefferson National Forest. *Sierra Club*, 897 F.3d at 589. But, we held that the BLM failed to determine whether "the

---

[4] "Sedimentation is defined as the 'process of deposition of a solid material,' or sediment, 'from a state of suspension or solution in a fluid' . . . ." *Sierra Club*, 897 F.3d at 590 n.5. Specifically, in rejecting the EIS's sedimentation analysis, we took issue with the Forest Service's acceptance of the EIS's estimation that sedimentation control measures would result in 79% containment of sediment -- a figure derived from a hydrological analysis MVP provided to FERC -- despite the Forest Service's estimation in comments on a draft of the hydrological analysis that 48% containment was a more appropriate figure. *See id.* at 595. We also questioned the Forest Service's acceptance of the EIS's conclusion that the Pipeline would increase sedimentation to levels in excess of 10% above the baseline, despite its earlier concerns -- again in comments on a draft of the hydrological analysis -- that such levels could negatively affect sensitive aquatic species. *See id.* at 595–96.

utilization of an existing right of way would be impractical," in violation of the MLA. *Id.* at 605 (emphasis deleted).

Therefore, we vacated the RODs of the Forest Service and the BLM and remanded this matter to the agencies. We directed the Forest Service to more thoroughly analyze the Pipeline's sedimentation impacts and apply the 2012 Planning Rule's soil and riparian resources requirements to the proposed Jefferson Forest Plan amendments for the Pipeline. *Sierra Club*, 897 F.3d at 596, 603. And we instructed the BLM to make a specific finding about the practicality of utilizing an existing right of way for the Pipeline. *Id.* at 605.

D.

Proceedings Since Remand

1.

The Forest Service

On remand, the Forest Service and the BLM prepared a supplemental EIS which sought to address the Pipeline's sedimentation impacts utilizing two hydrological analyses provided by MVP. But neither of these hydrological analyses, nor the supplemental EIS, considered water quality monitoring data from the United States Geological Survey ("USGS") monitoring stations fifteen miles outside the Jefferson National Forest, where construction of the Pipeline has occurred near the Roanoke River.

13

The USGS data showed water turbidity[5] values that were 20% higher downstream from the Pipeline's construction than upstream -- a significant difference from the 2.1% increase in sedimentation the hydrologic analyses predicted for the Roanoke River.

The Forest Service also elaborated on its analysis of the 2012 Planning Rule's application to the Pipeline. In particular, it determined that 10 of the 2012 Planning Rule's substantive requirements were directly related to the amendments to the Jefferson Forest Plan for the Pipeline:

> § 219.8(a)(2)(ii) – Soils and soil productivity; § 219.8(a)(2)(iii) – Water quality; § 219.8(a)(2)(iv) – Water resources in the plan area; § 219.8(a)(3)(i) – Ecological integrity of riparian areas; § 219.8(b)(3) – Multiple uses that contribute to local, regional, and national economies; § 219.9(a)(2) – Ecosystem diversity of terrestrial and aquatic ecosystems; § 219.10(a)(3) – Appropriate placement and sustainable management of infrastructure, such as recreational facilities and transportation and utility corridors; § 219.10(b)(1)(i) – Sustainable recreation, including recreation setting, opportunities, access, and scenic character; § 219.10(b)(1)(iv) – Other designated areas or recommended designated areas; and § 219.11(c) – Timber harvest for purposes other than timber production.

J.A. 582. The supplemental EIS provides that the amendments to accommodate the Pipeline are "in full compliance with the [2012] Planning Rule because all applicable substantive requirements are applied to provide protection to resources without

---

[5] "Turbidity refers to cloudiness caused by very small particles of silt, clay, and other substances suspended in water." Water Supply System: Health Concerns, *Encyclopaedia Britannica – Technology*, https://www.britannica.com/technology/water-supply-system/Health-concerns#ref1084761.

substantial lessening of protections for those resources across the [Jefferson National Forest]." *Id.*

2.

The BLM

As part of the supplemental EIS it prepared in conjunction with the Forest Service, the BLM evaluated whether existing rights of way on federal lands could accommodate the Pipeline without issuing a new right of way. In doing so, the BLM considered alternative routes collocating the Pipeline with the proposed route of the since-cancelled Atlantic Coast Pipeline,[6] with existing public roads, and with electric transmission lines. The BLM also considered several route variations. The BLM made specific findings about whether each alternative route or route variation was practical and concluded that "none . . . would [both] result in greater collocation on federal lands and be practical." J.A. 819. It determined that those alternative routes that would increase collocation

---

[6] On July 5, 2020, the energy companies behind the Atlantic Coast Pipeline announced that they would no longer move forward "due to ongoing delays and increasing cost uncertainty which threaten the economic viability of the project." Press Release, Dominion Energy, Dominion Energy and Duke Energy Cancel the Atlantic Coast Pipeline (July 5, 2020), https://news.dominionenergy.com/2020-07-05-Dominion-Energy-and-Duke-Energy-Cancel-the-Atlantic-Coast-Pipeline. The companies' decision came after we vacated several decisions of state and federal agencies approving the project. *See, e.g.*, *Friends of Buckingham v. State Air Pollution Control Bd.*, 947 F.3d 68 (4th Cir. 2020) (vacating Virginia environmental regulator's decision issuing permit to construct Atlantic Coast Pipeline compressor station); *Defs. of Wildlife v. U.S. Dep't of the Interior*, 931 F.3d 339 (4th Cir. 2019) (vacating Fish and Wildlife Service's biological opinion for Atlantic Coast Pipeline); *Sierra Club v. U.S. Dep't of the Interior*, 899 F.3d 260 (4th Cir. 2018) (vacating Fish and Wildlife Service's and National Park Service's approval of Atlantic Coast Pipeline).

15

"would be impractical due to a combination of constructability and safety challenges, increased environmental impacts, increased length and footprint, increased cost, and inability to serve the purposes of the [Pipeline] or the specific purpose of the route alternative in question." *Id.* at 819–20 (footnote omitted).

3.

FERC

In the meantime, FERC partially authorized MVP to use the "conventional bore method" to cross under the bodies of water along the Pipeline's projected route, including the four streams in the Jefferson National Forest, pending FERC's evaluation of the potential environmental impact of that method.

4.

Renewed RODs

Ultimately, on January 11, 2021, the Forest Service, via the United States Department of Agriculture's Under Secretary for Natural Resources and Environment, issued a second ROD approving the Pipeline. The renewed ROD adopted the Forest Service's environmental analysis in the supplemental EIS and again amended the Jefferson Forest Plan by modifying 11 plan standards to accommodate the Pipeline and limited the amendments only to the Pipeline. Petitioners sought review of the ROD in this court the same day it was issued.

Three days later, on January 14, 2021, the Secretary of the Interior issued a ROD granting the Pipeline a right of way in the Jefferson National Forest. The BLM's renewed ROD also adopted the supplemental EIS and again authorized a 30-year right of

way and associated temporary use permits for the Pipeline's proposed route through the Jefferson National Forest. Petitioners also filed a petition for review of that decision in this court on January 20, 2021. We consolidated the cases on appeal.

II.

"We may hold unlawful and set aside a federal agency action for certain specified reasons, including whenever the challenged act is arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with the law." *Sierra Club, Inc. v. U.S. Forest Serv.*, 897 F.3d 582, 589–90 (4th Cir. 2018) (alteration and internal quotation marks omitted); *see* 5 U.S.C. § 706(2).

> An agency's decision is arbitrary and capricious if the agency relied on factors which Congress has not intended it to consider, entirely failed to consider an important aspect of the problem, offered an explanation for its decision that runs counter to the evidence before the agency, or is so implausible that it could not be ascribed to a difference in view or the product of agency expertise.

*Id.* at 590 (quoting *Defs. of Wildlife v. N.C. Dep't of Transp.*, 762 F.3d 374, 396 (4th Cir. 2014)). "[O]ur oversight [of agency action is] 'highly deferential, with a presumption in favor of finding the agency action valid,' yet the arbitrary-and-capricious standard does not 'reduce judicial review to a rubber stamp of agency action.'" *Friends of Back Bay v. U.S. Army Corps of Eng'rs*, 681 F.3d 581, 587 (4th Cir. 2012) (quoting *Ohio Valley Env't Coal. v. Aracoma Coal Co.*, 556 F.3d 177, 192 (4th Cir. 2009)).

17

III.

Petitioners once again argue that the Forest Service and the BLM violated NEPA, the NFMA, and the MLA in permitting MVP to construct the Pipeline in the Jefferson National Forest.  We address each of Petitioners' arguments in turn.

A.

Predecisional Review

Petitioners first argue that the Forest Service violated its own regulations by failing to undertake the administrative "predecisional review" process before authorizing the Pipeline's route through the Jefferson National Forest.  On this point, we disagree with Petitioners.

The predecisional review process effectually prohibits the Forest Service from issuing a final decision on a matter without first offering an opportunity for eligible parties to object to the draft ROD and responding to each objection in writing.  *See* 36 C.F.R. §§ 218.7, 218.12.  It applies to "proposed actions of the Forest Service concerning projects and activities implementing [forest plans] documented with a [ROD]."  *Id.* § 218.1.  The "reviewing officer" charged with responding to the objections is a Forest Service or Department of Agriculture official with more authority than the official responsible for making the decision.  *See id.* §§ 218.3(a), 218.11.  But, significantly, "[p]rojects and activities proposed by the Secretary of Agriculture or the Under Secretary, Natural Resources and Environment, are not subject to" the predecisional review process.  *Id.* § 218.13(b).   This exception applies in this case.

18

In an attempt to evade this exception to the predecisional process, Petitioners assert that MVP, not the Under Secretary for Natural Resources and Environment, "proposed" the Pipeline project. But Petitioners' interpretation of the term "proposed" as it is used in the exception is too narrow and ignores the broader regulatory scheme. The regulations governing the predecisional review process make clear that a proposal, for purposes of the exception, does not mean the application triggering action by the Forest Service but, rather, how the Forest Service decides to act in response to that application.

The structure of the predecisional review process -- which essentially provides for an additional level of scrutiny of a decision by an official of higher rank than the decisionmaking official -- and the language of the regulation defining "reviewing officer" presume that officers within the agency make proposals. 36 C.F.R. § 218.3(a). There is no distinction based on the source of the project's application. The Forest Service's internal guidance reinforces this interpretation: "A proposed action is a proposal by the Forest Service to authorize, recommend, or implement an action to meet a specific purpose and need. . . . When the Forest Service accepts an external proponent's proposal (like a powerline or ski resort) it becomes an Agency proposal to authorize the action." U.S. Forest Serv., FSH 1909.15 – National Environmental Policy Act Handbook, ch. 10, § 11.2 (2012), https://www.fs.fed.us/emc/nepa/nepa_procedures/index.shtml.

The Under Secretary for Natural Resources and Environment signed the ROD amending the Jefferson Forest Plan to accommodate the Pipeline. The Under Secretary's approval "constitutes the final administrative determination of the U.S. Department of Agriculture." 36 C.F.R. § 218.13(b). Therefore, the proposal was not subject to the

19

predecisional review process.  *See* Project-Level Predecisional Administrative Review Process, 77 Fed. Reg. 47,337, 47,341 (proposed Aug. 8, 2012) (to be codified at 36 C.F.R. pt. 218) ("[36 C.F.R. § 218.13(b)] identifies that projects and activities authorized by the Secretary or Under Secretary of Agriculture are not subject to [the predecisional review] procedures.").

B.

Actual Sediment and Erosion Impacts

Next, Petitioners contend that the Forest Service and the BLM violated NEPA, the NFMA, and the MLA by inadequately considering the Pipeline's sediment and erosion impacts.  Specifically, Petitioners assert that 1) the sediment modeling MVP used in its hydrological analyses relied on unsupported and implausible assumptions; 2) evidence of the Pipeline's actual impacts indicates the modeling is unreasonable, and the Forest Service and the BLM did not address such evidence; and 3) the agencies failed to address whether erosion and sedimentation caused by the Pipeline would violate water quality standards.  We agree with Petitioners only as to the second of these assertions.

The Forest Service and the BLM erroneously failed to account for real-world data suggesting increased sedimentation along the Pipeline route.  There is no evidence that the agencies reviewed the USGS water quality monitoring data from the Roanoke River, which may indicate a significant increase in sedimentation beyond that predicted in the modeling used for the supplemental EIS.  At the very least, the supplemental EIS should have acknowledged this disparity and explained its impact on the agencies' reliance on the sedimentation data in the hydrological analyses.

20

But the Forest Service and the BLM suggest that the USGS data is not useful to their analysis for two reasons. First, they argue that the sediment modeling utilized in the supplemental EIS is not designed for site-specific comparisons. This argument begs the question -- how is the modeling useful to predict the Pipeline's environmental impact if it does not somehow reflect real-world data and scenarios demonstrating that impact?

Second, the agencies assert that Petitioners have not demonstrated how the USGS data is "relevant to the choice among alternatives with different environmental effects," which is the key consideration for their NEPA cost-benefit analysis. 40 C.F.R. § 1502.22. But this is an improper effort to shift the agencies' burden onto Petitioners. The Forest Service and the BLM, not Petitioners, are charged with fully considering the Pipeline's potential environmental impact before approving it.

The same is true of the agencies' argument that the USGS data should be discounted because it derives from locations outside the Jefferson National Forest. The Forest Service and the BLM suggest that the USGS data is unreliable because Petitioners "do not suggest that the land use [in the areas outside the forest where the USGS monitoring stations are located] is identical to the Forest sites," nor do Petitioners account for soil-loss mitigation measures or "the corresponding climactic conditions during the stream-gauge measurements." Resp'ts' Br. at 28. Again, the Forest Service and the BLM attempt to place the burden on Petitioners to demonstrate the similarities between the areas outside and inside the forest, rather than recognizing MVP's shortcomings. There is no reason to think (and the agencies have provided none) that the factors that could affect sedimentation in the four streams inside the forest that the Pipeline's

21

proposed route will cross will be any different inside the Jefferson National Forest than outside it, such that data from nearby locations outside the forest would not reflect the conditions within the forest.

By creating a false dichotomy between the impacts of construction inside and outside the Jefferson National Forest, placing the burden on Petitioners to explain the similarities between these two areas, and failing to address the USGS modeling that occurred nearby in the Roanoke River, the Forest Service and the BLM "entirely failed to consider an important aspect of the problem." *Sierra Club, Inc. v. U.S. Forest Serv.*, 897 F.3d 582, 590 (4th Cir. 2018) (quoting *Defs. of Wildlife v. N.C. Dep't of Transp.*, 762 F.3d 374, 396 (4th Cir. 2014)).  Therefore, we remand for the agencies to consider the USGS data and any other relevant information indicating that the modeling used in the EIS may not be consistent with data about the actual impacts of the Pipeline and its construction.

## C.

### Conventional Bore Method

Third, Petitioners argue that the Forest Service and the BLM violated NEPA by approving the use of the conventional bore method to cross the four streams within the Jefferson National Forest without first analyzing the method's environmental effects. Here again, we agree with Petitioners.  "It would be one thing if the Forest Service had adopted a new alternative that was actually within the range of previously considered alternatives . . . .  It is quite another thing to adopt a proposal that is configured

22

differently . . . ." *Dubois v. U.S. Dep't of Agric.*, 102 F.3d 1273, 1292–93 (1st Cir. 1996). The Forest Service and the BLM have done the latter here.

Although the supplemental EIS includes information about method, impact, safety, and environmental concerns related to conventional boring, the agencies' assent to MVP's use of conventional boring to construct the stream crossings is premature. Because MVP originally planned to use dry-ditch open cutting and wet cutting to construct the stream crossings, FERC's initial EIS considered the environmental impact of these methods. It did not extensively consider the conventional bore method because no stream crossings were to be constructed using that method.

Since then, MVP received authorization from FERC to modify how it would construct the stream crossings in the Jefferson National Forest. Specifically, FERC conducted a cursory review of MVP's request to switch to the conventional bore method and, after "informally consult[ing]" with the Fish and Wildlife Service, concluded that the change "is feasible and . . . will reduce [environmental] impacts on aquatic resources." J.A. 1200. However, FERC did not authorize MVP to construct any of the stream crossings using the conventional bore method because at the time, the Forest Service and the BLM had not yet approved the Pipeline's crossing through the Jefferson National Forest.

MVP has also requested to use the conventional bore method to construct other stream crossings outside the Jefferson National Forest. In response, FERC issued a notice indicating that it "will prepare an environmental document[] that will discuss the environmental impacts of" the requested change in the construction method for the

23

stream crossings.    Mountain Valley Pipeline, LLC; Notice of Scoping Period and Requesting Comments on Environmental Issues for the Proposed Amendment to the Certificate of Public Convenience and Necessity for the Mountain Valley Pipeline Project, 86 Fed. Reg. 15,215, 15,215 (Mar. 22, 2021).

FERC characterizes MVP's request to switch to the conventional bore method as a request to amend the FERC Certificate for the Pipeline.  *Id.*  Without a FERC Certificate authorizing it to do so, MVP cannot "engage in the transportation or sale of natural gas . . . or undertake the construction or extension of any facilities therefor, or acquire or operate any such facilities or extensions thereof."  15 U.S.C. § 717f(c)(1)(A).  Therefore, it follows that MVP cannot construct the stream crossings outside the Jefferson National Forest using the conventional bore method until FERC actually fully approves the amendment to the FERC Certificate to authorize that method.

In this regard, although FERC has given notice that it will issue a document assessing the environmental impacts of the change in the stream crossing construction method, it has not yet done so.    Despite FERC's approval of the use of the conventional bore method for the stream crossings inside the Jefferson National Forest, the Forest Service and the BLM, in deciding whether to approve the Pipeline's route over those lands, would surely benefit from FERC's environmental analysis of the use of the conventional bore method for other stream crossings outside the Jefferson National Forest.  As a result, the Forest Service and the BLM improperly approved the use of the conventional bore method for the four streams in the Jefferson National Forest without first considering FERC's analysis.

24

D.

Alternative Routes

Petitioners also argue that the Forest Service and the BLM insufficiently evaluated alternative routes for the Pipeline that do not pass through national forests, in violation of the MLA. We reject this argument for essentially the same reason we rejected it in the prior iteration of this case. *See Sierra Club*, 897 F.3d at 599–600. The supplemental EIS amply demonstrates that the agencies did, in fact, consider alternative routes but concluded that the environmental impacts would simply be shifted to other lands and the increased length of the Pipeline's route would affect more acreage, incorporate additional privately owned parcels, and increase the number of residences in close proximity to the Pipeline. Therefore, the record reveals that the BLM and the Forest Service complied with their obligations to assess alternative routes.

E.

Increased Collocation of Rights of Way

Relatedly, Petitioners assert that the BLM violated the MLA because it did not demonstrate that route alternatives that would increase collocation within the Jefferson National Forest were impractical. This argument likewise fails.

Pipeline routes crossing national forest lands must indeed be collocated with existing rights of way "to the extent practical." 30 U.S.C. § 185(p). But the BLM's interpretation of this standard is reasonable, and its framework for evaluating whether collocation is "practical" is sound.

25

Because neither the MLA nor its accompanying regulations define the meaning of "practical" as it is used in this provision, the BLM has interpreted it to mean "the suitability of a route alternative for achieving [the project's] purpose" -- here, "construct[ing] a pipeline to deliver natural gas from the [Pipeline's] beginning point to its endpoint, via its mid-route delivery points, in a safe, environmentally responsible, and cost-effective manner." J.A. 806. The BLM justified this interpretation by considering the term's common usage and legal definition, the MLA's implementing regulations,[7] the only decision applying the term,[8] and interpretations of the term "practicable" in other environmental regulations.[9] The BLM also enumerated and explained six factors for

---

[7] Specifically, the supplemental EIS reasons, "The BLM's regulations note that one of the objectives of the BLM's pipeline [right of way] program is to '[p]romote[] the use of rights-of-way in common considering engineering and technological compatibility,' and that the use of [rights of way] in common may be required 'where safety and other considerations allow.'" J.A. 805 (quoting 43 C.F.R. §§ 2881.2(c), 2882.10(b)).

[8] *Wyo. Indep. Producers Ass'n*, 133 IBLA 65, 82 (1995).

[9] Citing 40 C.F.R. §§ 230.3(l) and 230.10(a), the supplemental EIS states, "[A] regulation issued to implement section 404 of the Clean Water Act prohibits the issuance of a . . . permit 'if there is a practicable alternative to the proposed discharge' that is environmentally preferable, and defines 'practicable' as including 'consideration [of] cost, existing technology, and logistics in light of overall project purposes.'" J.A. 806. The supplemental EIS continues, "In reviewing decisions made under this regulation by the U.S. Army Corps of Engineers . . . courts have deferred to the agency's practicability determinations, and upheld its consideration of factors including cost, construction delays, logistical feasibility, and 'the objectives of the applicant's project.'" *Id.* (citing *Friends of Santa Clara River v. U.S Army Corps of Eng'rs*, 887 F.3d 906, 912, 921–22 (9th Cir. 2018); *Friends of the Earth v. Hintz*, 800 F.2d 822, 833–34 (9th Cir. 1986); *Nat'l Parks Conservation Ass'n v. Semonite*, 311 F. Supp. 3d 350, 377–78 (D.D.C. 2018), *rev'd*, 916 F.3d 1075 (D.C. Cir. 2019)).

assessing "practicality": 1) "construction challenges and potential safety hazards"; 2) "environmental consequences"; 3) "increase[s] in the pipeline's length and footprint"; 4) "the ability . . . to serve MVP's mid-route delivery points"; 5) "additional costs"; and 6) "the likelihood that the route would achieve any specific purpose." *Id.* at 806–07.

At its core, Petitioners' assertion that the BLM failed to apply the test it developed to the Pipeline boils down to no more than their disagreement with the outcome of the BLM's analysis. But, for the reasons outlined, we conclude the BLM did not err when assessing the Pipeline route's collocation with existing rights of way in the Jefferson National Forest.

F.

2012 Planning Rule

Finally, Petitioners argue that the Forest Service again failed to apply its 2012 Planning Rule's directly related substantive requirements within the scope and scale of the amendments to the Jefferson Forest Plan to accommodate the Pipeline, as the 2016 Revised Rule requires. Petitioners assert that the amendments do not actually comply with any of the corresponding substantive requirements set forth in the 2012 Planning Rule and that the Forest Service applied an incorrect legal standard when it determined that the amendments did comply with the substantive requirements. We agree.

We previously concluded that the 2012 Planning Rule's soil and riparian resources requirements apply to the proposed amendments for the Pipeline. *Sierra Club*, 897 F.3d at 603. In its renewed ROD, the Forest Service acknowledges that the amendments are "directly related" to these requirements, but it maintains that it has complied with the

27

requirements because it "applied [them] to provide protection to resources without substantial lessening of protections for these resources." J.A. 582.

This conclusion is not sound. First, the 2012 Planning Rule does not demand that the amendments protect forest resources without substantial lessening of protections. Rather, a forest plan "must include . . . components . . . to *maintain or restore* the ecological integrity of terrestrial and aquatic ecosystems and watersheds in the plan area." 36 C.F.R. § 219.8(a)(1) (emphasis supplied). Because the Forest Service did not sufficiently consider the Pipeline's actual sediment and erosion impacts, as we have already explained, the amendments to the Jefferson Forest Plan may not "maintain" soil and riparian resources within the scope of the 2012 Planning Rule. And because the Forest Service does not have a clear indication from FERC about the environmental impacts of the use of the conventional bore method to cross the four streams within the Jefferson National Forest, it is unclear whether the amendments to the Jefferson Forest Plan for the Pipeline will even "maintain" the forest's resources, as the 2012 Planning Rule intended.

Further, the Forest Service cannot rely on the notion that because the Pipeline will affect only a minimal fraction of the entire Jefferson National Forest, application of the existing forest plan (*i.e.*, without Pipeline-related amendments) outside this area will continue to provide adequate protections. "If the Forest Service could circumvent the requirements of the 2012 Planning Rule simply by passing project-specific amendments on an ad hoc basis . . . the substantive requirements in the 2012 Planning Rule . . . would be meaningless." *Cowpasture River Pres. Ass'n v. Forest Serv.*, 911 F.3d 150, 164 (4th

28

Cir. 2018), *rev'd and remanded on other grounds*, 140 S. Ct. 1837 (2020). In any event, the Forest Service has not provided an analysis of whether application of the existing Jefferson Forest Plan is adequately protecting these resources elsewhere in the Jefferson National Forest.

As a result, we are compelled to once again remand so that the Forest Service can properly apply the 2012 Planning Rule's soil and riparian resources requirements to the Pipeline amendments.

IV.

Conclusion

In sum, we conclude that the Forest Service and the BLM 1) inadequately considered the actual sedimentation and erosion impacts of the Pipeline; 2) prematurely authorized the use of the conventional bore method to construct stream crossings; and 3) failed to comply with the Forest Service's 2012 Planning Rule. Therefore, we grant the petitions for review as to those errors; deny the petitions with regard to Petitioners' remaining arguments about the predecisional review process, alternative routes, and increased collocation; vacate the decisions of the Forest Service and the BLM; and remand this matter to the agencies for further proceedings consistent with this opinion.

*PETITIONS FOR REVIEW GRANTED IN PART AND DENIED IN PART,*
*VACATED AND REMANDED*